1

2

3

4                                   UNITED STATES DISTRICT COURT

5                               NORTHERN DISTRICT OF CALIFORNIA

6

7    DECATUER CARTER,                              Case No.  18-cv-06313-DMR

8                        Plaintiff,
                                                   FINDINGS OF FACTS AND
9            v.                                    CONCLUSIONS OF LAW

10   JAI-PUT ENTERPRISE INC., et al.,

11                       Defendants.

12

13          Plaintiff Decatuer Carter filed this lawsuit against Defendants Jai-Put Enterprise Inc. and

14   Krishna Vepa, alleging violations of the Federal Labor Standards Act ("FLSA"), 29 U.S.C. § 201

15   *et seq.*, the California Labor Code, the California Unfair Competition Law ("UCL"), Cal. Bus. &

16   Prof. Code § 17200 *et seq.*, and California common law.  [Docket No. 1 ("Compl.").]  Carter

17   asserts all claims for himself and, for certain claims, on behalf of other aggrieved employees under

18   California's Private Attorneys' General Act ("PAGA"), Cal. Lab. Code § 2698 *et seq.*

19          The court held a bench trial on August 16, 17, 18, and 19, 2021.[1]  Following the trial, the

20   parties submitted proposed findings of fact and conclusions of law.  [Docket Nos. 114 ("Pl.

21   FF/CL"), 115 ("Def. FF/CL").]  Pursuant to Federal Rule of Civil Procedure 52(a), the court

22   makes the following findings of fact and conclusions of law.

23   **I.      FINDINGS OF FACT**

24          **A.  Junk King Operations**

25          Defendant Jai-Put Enterprise, Inc. dba Junk King ("Junk King") is a California

26

27   _____

28   [1] Transcripts of the proceedings are available at Docket Nos. 110 ("Tr. Vol. 1"), 111 ("Tr. Vol.
     2"), 112 ("Tr. Vol. 3"), and 113 ("Tr. Vol. 4").

United States District Court
Northern District of California

United States District Court
Northern District of California

1  corporation[2] and a franchisee of Junk King Franchise Systems.  Junk King is independently owned

2  and operated by Defendant Krishna Vepa ("Vepa") and has locations in Livermore and San

3  Leandro.

4          Junk King provides junk hauling services to businesses, property owners, and residential

5  customers.  Its primary service is to haul away junk and debris.  Junk King also cleans up

6  properties, performs landscaping, and does "soft demolitions," such as taking out kitchen islands

7  and cabinets.  It exclusively operates in California and never performs jobs across state lines.

8          Junk King employees work varying numbers of hours each week because of the on-

9  demand nature of the job.  Vepa cannot guarantee that employees will work five days a week or

10  eight hours a day because the schedule depends on what jobs are scheduled by customers.

11  Employees are usually scheduled to work from 7:00 a.m. to 4:00 or 4:30 p.m. on most workdays.

12  On weekends, employees start at 8:00 a.m. or sometimes later.  Vepa tries to schedule employees

13  to work on their preferred days of the week only.

14          Every day between approximately 4:00 p.m. to 6:30 p.m., Vepa texts employees with the

15  schedule for the next day.  He often sends those texts to the employees' personal phones.  Vepa

16  assigns the daily routes, which generally have four to five jobs each and sometimes more.  All the

17  jobs for one route are usually in the same geographic zone.  There is no set route that any

18  particular truck takes on a particular day; instead, the route depends on the jobs scheduled that

19  day.  Sometimes the route will change throughout the day as bookings are added or removed.

20          When employees come to work in the morning, they clean out the trucks from the day

21  before, pick up the keys to their assigned trucks, receive their routes, and get paired into teams.

22  Typically a crew of two employees is assigned to each Junk King truck—one driver and one

23  navigator.  The navigator assists the driver, manages the job schedule and routing, and

24  communicates with the customers.  Crews sometimes provide pricing quotes at a particular job site

25  and negotiate pricing with the customer.  The driver and navigator both haul items and load trucks.

26          During the day, crews usually need to go to a dump yard or recycling center to empty their

27

28  [2] The court takes judicial notice of Jai-Put Enterprise, Inc.'s articles of incorporation, available on
the California Secretary of State website.

United States District Court
Northern District of California

trucks before going to the next job.  Trucks typically need to make at least one dump run every day.  When employees go to the dump, they must go through a weigh scale and an inspection and go back through the weigh scale when they leave.  Vepa testified that he cannot predict how long a dump run will take.  He said that trucks can get stuck at the dump for up to two and a half hours.  However, two witnesses called by the defense explained that the dump run takes less time than Vepa stated.  Christopher Beltre, a current Junk King driver, testified that a dump run usually takes 10 to 15 minutes, although occasionally it can take up to an hour.  Donald Gradford, a current Junk King driver and supervisor, testified that dump runs take 15 minutes to an hour.

Junk King uses the Junkware app, which is provided by Junk King Franchise Systems.  Employees clock in and out using the smart phone-based Junkware app.  The daily schedule and descriptions of each job on the assigned route are also in the app.  Junk King employees use the app to record completed jobs and payments.  Junk King Franchise Systems has a national call center to receive customer calls.  The call center can be contacted through the app.

**B. Telephone Purchase Plan**

Junk King employees are required to use smart phones to communicate with Vepa and customers and to process credit card payments.  According to Vepa, when Junk King began operating in 2016, there were company-owned phones available for employee use.  Vepa testified that employees were not required to use their own phones.  As discussed below, Carter testified that he used his personal cell phone for work purposes for the first two months of his employment, from late November 2016 to January 2017.  In 2017, Vepa started a company-sponsored phone policy under which employees could purchase a cell phone and split the cost 50/50 with Junk King.  The employees' portion of the costs were deducted from their wages.  Vepa testified that the phone plan was voluntary and that six out of the approximately ten employees signed up for the plan at that time.  Employee records indicate that seven employees signed up for the telephone purchase plan,[3] but only five had payroll deductions for the phone purchase.  *See* Pl. Ex. 4 (Carter); Pl. Ex. 128 (Parshey); Pl. Ex. 11 at JKCC-2082 (Crowder), at JKCC-2092 (Moore), and

---

[3] The seven employees are Carter (Pl. Ex. 5), Beltre (Pl. Ex. 32), Crowder (Pl. Ex. 57), Moore (Pl. Ex. 110), Ochoa (Pl. Ex. 120), Parshey (Pl. Ex. 127), and Qoro (Pl. Ex. 139).

1   at JKCC-2095 (Qoro).  The employees were allowed to keep the phone and use it for personal

2   purposes.  Junk King eliminated the telephone policy in August 2017, although some employees

3   chose to keep the phones they obtained through the plan.

4       **C. On-Duty Meal Period Policy and Meal Breaks**

5          Since the beginning of its operations in 2016 to the present, Junk King has had an on-duty

6   meal period policy.  Under the policy, employees are paid their normal hourly rate for their lunch

7   period.  Vepa testified that the policy exists because it is not practical to coordinate the truck

8   routes in a way that allows employees to return to the office in Livermore or San Leandro for an

9   uninterrupted 30-minute lunch break.  Vepa also testified that the on-duty meal period policy is

10  necessary because it is not possible for Junk King employees to take a lunch break at the same

11  time every day.  For example, Vepa testified that it is difficult to predict how long it will take

12  employees to complete a dump run and he does not want employees to have to take their lunch

13  break while at the dump.

14         Vepa testified that the size and scope of jobs is also unpredictable, since sometimes the

15  customer's description of the job does not accurately convey how long it will take to complete.

16  Travel time is also unpredictable because of varying traffic conditions.  Sometimes the daily

17  schedule changes throughout the day if customers do not appear for their scheduled time window

18  or if new jobs are added to a route.  Vepa stated that the on-duty meal period is voluntary and may

19  be revoked by an employee at any time.

20         Beltre testified that it was impractical to return to the office to take a meal break because it

21  would take up too much time on the route.  Gradford also testified that it was not possible for

22  employees to return to the Livermore or San Leandro offices to take meal breaks due to the nature

23  of the job.  Gradford stated that it would not be feasible to have other employees drive out to a job

24  site to relieve the working employees for a lunch break.

25         Vepa's testimony and the payroll records establish that prior to February 1, 2019

26  employees did not clock in and out for lunch.  After that date, Junk King employees were required

27  to clock in and out for lunch.  Since then, employees do not take their meal break at the same time

28  every day but instead are expected to eat sometime between 11:00 a.m. to 1:00 p.m.  They are

allowed to take their lunch break earlier if they want.  Vepa now sends automatic texts to employees reminding them to clock out for their lunch period and to clock back in afterward.

Vepa testified that the on-duty meal period agreement is still in effect and is still necessary due to the unpredictable nature of the work.  He expects his employees to eat during their lunch period, he does not "micromanage how long they take to eat," and they sometimes take a meal break for up to an hour and a half.  Employees are expected to eat somewhere along their assigned route.  Beltre testified that in his experience, employees take meal breaks that last approximately 30 minutes to an hour.

Carter testified that Vepa told him he must sign the on-duty meal period policy in order to be hired.  Vepa testified that he never told Carter that he had to sign the on-duty meal period agreement in order to work at Junk King.  Beltre stated that he understood that the on-duty meal period policy was voluntary and he could opt out.  Gradford also testified that he knew he could revoke the on-duty meal agreement at any time.  The court need not make findings as to whose testimony on this point is more credible because, as explained below in the conclusions of law, the on-duty meal period policy is unlawful regardless of whether it was voluntary.

Carter testified that he never took a meal break while working for Junk King.  He also testified that he never saw any other employee take a meal or rest break.  According to Carter, Vepa told them to work through their meal breaks to "make sure we make our quotas and he can make his money at the end of every week." Tr. Vol. 3 at 414:23-4:15:3. Vepa testified that Carter never complained to him about not getting meal breaks.  Beltre testified that he was fairly certain that Carter took meal breaks with him when they worked together as a crew and that it would be unusual for one person to take a meal break while the other did not.  Gradford testified that he has always taken a meal break while working in the field and that the navigators he has worked with take meal breaks with him.  Alauna Helu, a current Junk King driver, testified that he and the employees he works with in the field take lunch breaks, and that Vepa has never told him not to take lunch.

Vepa testified that employees are expected to respond to phone calls and texts from Vepa even while on a meal break.  Gradford testified that he sometimes receives or makes work-related

1  calls during his meal breaks.  The court need not decide whose testimony on this point is more

2  credible regarding whether Carter ever took meal breaks.  As explained below, for purposes of

3  Carter's individual meal break claim, Vepa's testimony as corroborated by Gradford's testimony

4  establishes that Defendants did not provide compliant meal breaks to Carter as required by

5  California law.[4]

6         The court examined Plaintiff's Trial Exhibit 3 (JKCC-001809 to -10) to determine the

7  number of days that Carter worked more than five hours.  The court finds that Carter worked 120

8  days without compliant meal breaks at the following hourly rates: 53 days at $13.50/hour, 29 days

9  at $14.25/hour, and 38 days at $14.50/hour.

10        **D.  Overtime**

11        Prior to February 1, 2019, Junk King did not count the on-duty meal period toward the

12  total number of hours worked for the purposes of calculating overtime.  In other words, overtime

13  pay began after the employees' 9th hour of work in a day or after their 45th hour of work in a

14  week.  Vepa testified that when he instituted the on-duty meal period policy, he did not understand

15  that the on-duty meal period counted as hours worked for the purposes of overtime.  Tr. Vol. 2 at

16  272:15-19 ("Q: . . . Why then did you decide to have the 9/45-hour [overtime] provision . . . you

17  talked about earlier?  A: So the rationale for me was it was eight hours straight time plus one hour

18  lunchtime . . . .").  He believed that it was legal to have on-duty meal periods as long as employees

19  were paid their regular rate for the on-duty meal period.

20        On February 1, 2019, Junk King began paying employees overtime after their eighth hour

21  of pay in a day or after their 40th hour of work in a week.  Under the new policy, employees are

22  still paid their regular hourly rate for their on-duty meal period, but they are paid overtime for

23  every hour they work over eight hours.

24        **E.  Rest Breaks**

25        Vepa testified that he encourages his employees to take rest breaks as needed.  Junk King's

26

27  _____

    [4] Also explained below, in granting Defendants' motion in limine No. 1, the court prohibited
28  Carter from seeking penalties under PAGA for meal break violations as a result of Carter's failure
    to timely disclose his PAGA damages and theories.

United States District Court
Northern District of California

1    official written policy instructs employees to take at least two 15-minute breaks, but Vepa testified

2    that he tells employees to take longer or more breaks if they need to.  Employees are not required

3    to tell Vepa when they are going on a break.

4        Carter testified that he never took rest breaks while employed by Defendants except when

5    customers asked him to take a break.  He stated that Vepa wanted employees to "work as fast as

6    possible" and made sure they were "always constantly working so there's no down time."  Tr. Vol.

7    3 at 417:1-5.  He also testified that he received numerous text messages from Vepa while he was

8    working, anywhere from 5 to 50 messages per day.  Vepa testified that Carter never complained to

9    him about not getting rest breaks.  Beltre testified that Vepa encourages employees to take breaks

10   and that he and other employees frequently take multiple breaks per day.  Beltre recalled taking

11   rest breaks with Carter on the days they worked together.  Beltre stated that employees do not

12   work the whole day without stopping and that he never saw Carter work a whole day without a

13   rest break.  Beltre also testified that he has never heard from any other employee that they were

14   unable to take a meal or rest break during the day.  He said that he has never received incessant

15   phone calls or texts from Vepa telling him to get back to work and that he never witnessed such

16   calls and texts from Vepa to Carter.  Gradford stated that in the five years he has worked for

17   Defendants, there has never been a day where he missed a rest break.  Like Beltre, he testified that

18   Vepa encourages employees to take breaks.  Helu also testified that he takes breaks during the day.

19   The court finds that the testimony of Beltre, Gradford, and Helu on the issue of rest breaks is

20   credible.  Carter's testimony that he never took rest breaks while employed by Defendants is not

21   credible.

22       **F.  Carter's Employment**

23       Vepa hired Carter to be a navigator on November 29, 2016.  He was terminated on August

24   12, 2017.

25       Carter worked for Junk King in Boston before relocating to California.  While working for

26   Boston Junk King, he was able to take meal breaks at the same time every day, between noon and

27   1:00 p.m.  None of his Boston supervisors ever told him that he could not take a meal break

28   because of the nature of the work.  Carter's duties for the Boston Junk King franchise were

1    substantially the same as his duties for Defendants' Junk King franchise except that in Boston,

2    employees sometimes needed to shovel snow and de-ice the trucks.

3           Carter contends that he was not paid for certain time that he worked off the clock.  He

4    testified that he sometimes arrived early, and that he would clock in and start working.  He

5    testified that his clock-in time was sometimes overridden by management.  According to Carter,

6    this happened 15 to 20 times.  However, Carter did not identify a single time or general time

7    period that this occurred even though his time records are admitted in evidence.  Vepa testified

8    that on occasion, he changed a clock-in time to reflect a 7:00 a.m. start time if an employee

9    clocked in earlier than that.  Vepa explained that an employee is expected to clock in at 7:00 a.m.

10   and not earlier, when the employee has a 7:00 a.m. start time.

11          From his date of hire on November 29, 2016 until January 29, 2017, Carter used his

12   personal phone for work purposes for about eight to twelve hours per day.  His monthly phone bill

13   was $50 per month.

14          On January 23, 2017, Carter signed the Junk King phone purchase plan.  Pl. Ex. 5.  At the

15   time, Carter already had a personal cell phone and did not want to buy a phone through the plan.

16   According to Carter, Vepa told employees that they would be fired if they did not participate in the

17   plan.  Carter testified that $17.12 was deducted from each paycheck to pay for the phone

18   purchased through the Junk King plan.  Vepa testified that he never told Carter he would be fired

19   if he did not participate in the phone purchase plan.   Beltre also participated in the phone purchase

20   plan.  He testified that Vepa never told him he would be fired if he did not sign up for the phone

21   plan.  He stated that he did not think every employee signed up for the plan and that he was not

22   aware of anyone being fired for not participating.  The court need not decide whether the Junk

23   King telephone purchase plan was voluntary, because as explained below, the wage deductions for

24   the plan are illegal regardless of whether participation was voluntary.

25          Carter offered testimony about three incidents that he contends led to his termination in

26   August 2017 in retaliation for complaining about health and safety issues.  On one occasion in

27   February 2017, he and other employees were scheduled to clean out a homeless encampment near

28   a Home Depot in Oakland.  Carter testified that he and others called Vepa and told him that there

United States District Court
Northern District of California

8

were needles, human fecal matter, and human urine on the site that presented health and safety issues.  Carter testified that Vepa told them they must keep working if they wanted to keep their jobs.  Carter stated that the employees asked for safety equipment such as masks with respirators, Hazmat suits, and thick gloves but Vepa refused to provide these.  Carter said that after he complained about the job near Home Depot, Vepa started giving him "less desirable" routes.  Vepa testified that he did not force Carter to do that job but instead sent another employee with a forklift to complete it.

On another occasion, around spring or summer 2017, Carter performed a job at a residence.  When he and the other Junk King employees arrived, they found that there were large piles of items and trash everywhere.  The piles of items were saturated with cat urine, rat urine, and rat feces.  There were also used adult diapers filled with human feces and two cat carcasses that the employees had to clean up.  Carter testified that he called Vepa, told him about the incident, and asked Vepa for safety materials such as masks, gloves, and feet coverings, but that he did not receive them.

Carter testified about a third incident.  He did not state when it occurred, or when it took place in relation to the other two events.  This incident involved a job that he and other employees performed in an abandoned house.  The roof of the house had collapsed and one of the workers fell halfway through the floor.  There were also rats and milk jugs filled with human urine.  Carter testified that when the employees called Vepa to complain about the unsafe working conditions, he "didn't really care" that the employee had fallen partially through the floor and "just wanted to know how long . . . it was going to take us to finish the job."  Tr. Vol. 3 at 419:3-7.

Vepa testified that he does not recall Carter ever complaining about any safety issue on the job.  Beltre testified that Vepa always wanted employees to be safe on the job and that Vepa provided safety equipment like gloves and sanitizer.  Beltre said that employees can take the safety equipment from the Junk King office any time they need it.

The court need not decide whose testimony about these incidents is more credible because, as discussed below, the court finds that Carter has not established a causal link between his complaints and his termination.

United States District Court
Northern District of California

1    Vepa testified that he decided to terminate Carter's employment after one of Carter's job

2    assignments that involved picking up items from an auction house.   The customer was being

3    undercharged at a rate of $400 to $450 even though Junk King's rate for a full truckload at that

4    time was $628.  Vepa wrote a note in the Junkware app about the job, stating that it should not be

5    done for less than $600.  Both the driver and navigator can see notes written on the Junkware app.

6    Carter testified that he never saw any notes about the job in the Junkware app.

7    On Thursday August 10, 2017, the day the job was scheduled to be completed, Vepa tried

8    several times to call Carter and his driver partner Joshua Parshey but did not get a response from

9    either of them.  He also sent a text saying "call me."  Carter testified that he does not recall having

10   received any texts from Vepa before he and Parshey completed the job.

11   Around 11:00 a.m. that day, Carter and Parshey spoke with Vepa and told him they had

12   completed the job for the original $400 quoted price.  Vepa asked Carter and Parshey why they

13   undercharged the job and "didn't get any straight answer."  Tr. Vol. 3 at 288:17.  Vepa later found

14   out through the customer that Parshey had negotiated a "long-term" reduced rate with the

15   customer but had concealed it from Vepa.  Vepa testified that Parshey had misleadingly told Vepa

16   that the lower rate was just an introductory price for the first six loads and would be revised later.

17   Carter testified that he did not negotiate with the customer about the price for the job

18   because Parshey told him the price had already been negotiated.  Carter stated that he did not

19   know of any dispute between Parshey and Vepa about the price of that job.  According to Carter,

20   Vepa previously told employees to honor the price quoted for a job even if they believed it was

21   too low.  Vepa testified that while Carter had not negotiated the lower price with the customer, "he

22   as a co-passenger or a navigator had equal responsibility sitting in the truck of reading the job

23   notes and if in doubt had to ask me."  Tr. Vol. 2 at 328:23-329:4.

24   On Saturday, August 12, 2017, Carter and Parshey called Vepa and asked him why they

25   were not being scheduled for work.[5]  Vepa told them over the phone that their employment was

26   terminated.  Carter and Parshey came to see Vepa in the office that day, asking why they were

27   _____

28   [5] Carter said that Vepa called him.  Tr. Vol. 3 at 423:2-5.  The discrepancy in testimony is not
     material to the court's findings or conclusions.

being fired and demanding their last paycheck.  Vepa testified that he told them he could not process the paycheck over the weekend but that he would pay them the following Monday.  Carter testified that Vepa told them they would not be getting their final paycheck and "we should see him in court."  Tr. Vol. 3, 423:23-424:1.  According to Carter, he and Parshey never received their final paychecks.

Vepa testified that after he fired Carter, he reimbursed Carter for the money that had been deducted from his paycheck for the phone policy, and Carter kept the phone.  Carter testified that when he was fired, he paid Vepa about $200 for the phone he purchased through the phone plan and kept the phone.

Carter testified about the emotional and physical effects he experienced as a result of losing his job.  He offered this testimony to establish damages relating to his retaliation and wrongful termination claims.  The court does not make findings regarding Carter's claim for emotional distress and physical damages because, as explained below, Carter did not meet his burden to prove his claims for retaliation and wrongful termination.

**G.  Factual Findings Regarding Aggrieved Employees**

Carter seeks civil penalties under PAGA on behalf of himself and 37 current and former Junk King employees for Defendants' violations of the California Labor Code.  In the pretrial process, the court ruled that Carter was precluded from seeking particular PAGA penalties.  In ruling on Defendants' motion in limine No. 1, the court held that Carter was barred from pursuing certain PAGA penalties because he failed to disclose any information about them until the brink of trial, even though he had a duty to timely supplement his response to an interrogatory calling for this information.  *See* Tr. Vol. 1, 11:14-29:25.  Until the pretrial filings, Carter had not provided any amount or calculation of the PAGA penalties he was seeking, either in his initial disclosures or in discovery.  For the first time in his pretrial statement, Carter requested PAGA penalties in the amount of $1,066,050.[6]  Defendants filed motion in limine No. 1 to exclude evidence to support

---

[6] Carter's pretrial statement expresses the total of the various penalties as $741,850, but this clearly is a math error.

United States District Court
Northern District of California

1    damages that Carter had not previously disclosed, particularly the PAGA penalties.[7]   [Docket No.

2    79.]

3            The court determined that although Carter's late disclosures were not substantially

4    justified, they were harmless with respect to certain PAGA theories because those theories rest

5    solely on time records and other documentary evidence in Defendants' possession.  Thus, Carter

6    was permitted to seek PAGA penalties for overtime violations stemming from the on-duty meal

7    period policy to the extent that those violations were based "on the theory that the defense did not

8    have to pay overtime for the ninth hour."  Tr. Vol. 1 at 27:13-17.  The evidence for these claims is

9    located in the payroll and personnel records, all of which are in Defendants' possession.  For the

10   same reasons, Carter was allowed to pursue derivative PAGA penalties for Defendants' failure to

11   timely pay all overtime wages due at the time of separation from employment in violation of

12   Labor Code sections 201 and 202, as well as violations of Labor Code section 221 stemming from

13   the telephone purchase plan.  *Id.* at 27:18-25.  Similarly, Carter was permitted to pursue PAGA

14   penalties for wage statement violations under Labor Code section 226 because they were

15   derivative of the overtime violations.  *Id.* at 29:16-19.

16           However, for other PAGA penalties, the court held that Carter's lack of diligence and

17   failure to timely supplement his discovery responses resulted in material harm to Defendants

18   because Carter's actions precluded Defendants from understanding Carter's PAGA arguments and

19   engaging in necessary discovery and trial preparation to mount their defense.

20           Thus, the court held that Carter could seek PAGA penalties for missed meal breaks only to

21   the extent he could establish violations based solely on documents in Defendants' possession, i.e.,

22   solely on the theory that employees signed unlawful on-duty meal period agreements.  Tr. Vol. 1

23   at 28:9-15.  The court specifically barred Carter from seeking meal break PAGA penalties based

24   on two other theories, *see* Tr. Vol. 1 at 28:16-29:12, including the theory that employees did not

25   _____

26   [7] Defendants also challenged Carter's calculation of his own damages because the pretrial
     statement reflected different calculations than Carter had disclosed in discovery.  In denying this
27   aspect of Defendants' motion, the court determined that the changes in Carter's individual
     damages were not prejudicial to Defendants' ability to defend against them.  Tr. Vol. 1 at 24:15-
28   25:1.

1   receive a duty-free meal period because they were expected to respond to Vepa's communications

2   during their meal breaks:

> Similarly, plaintiff's theory of meal periods for aggrieved individuals resting on evidence that they had to be on call all the time, that they were constantly being called by Mr. Vepa, relies on more than just Mr. Vepa's testimony. It relies on others. And this is something that [defense counsel] could have developed— developed a defense for by talking to individuals or getting them deposed and having them ready to come to trial to rebut that.
>
> So I will not allow the theory to go forward for aggrieved employees on—for meal periods because plaintiff's failure to supplement was not harmless.

8   Tr. Vol. 1 at 29:2-12.[8]

9          For similar reasons, the court barred Carter from seeking PAGA penalties for violations of

10  Labor Code section 2802 for unreimbursed business expenses because proof would require

11  individualized testimony by aggrieved employees. Carter's discovery failures robbed Defendants

12  of the opportunity to talk to employees and potentially name them as witnesses. *Id.* at 27:2-8.

13         The parties agree that the relevant time frame for Carter's PAGA claim starts with the pay

14  period beginning August 7, 2017. As to the end point, the record contains Defendants' payroll

15  records up to August 3, 2019 and no later. Nevertheless, Carter seeks penalties for Labor Code

16  violations for certain employees beyond August 3, 2019. For example, Carter reports that Naod

17  Assefa worked 3.5 hours of overtime during the pay period from August 4, 2019 to August 17,

18  2019. Pl. FF/CL at 53. He claims that Defendants' payroll records "do not show any

19  compensation paid to Assefa for this time period." *Id.* Carter's assertion is misleading and

20  obfuscating because Defendants' payroll records after August 3, 2019 are not in the record, Assefa

21  did not testify, and Carter has not pointed to any admitted evidence to establish Labor Code

22  violations after August 3, 2019. Accordingly, the court defines the relevant time period for the

23  purposes of PAGA as from **August 7, 2017 through August 3, 2019** (the "PAGA penalty

24  period").

25         In a similar vein, Carter asserts that Joshua Parshey worked 5.74 hours of overtime during

26  the pay period from August 7, 2017 to August 20, 2017. Pl. FF/CL at 353. He says that "[t]here

27

28  [8] Carter voluntarily withdrew any claim for PAGA penalties for other aggrieved employees based on alleged rest break violations. *See* Tr. Vol. 1 at 29:13-15.

is no record of pay issued to Parshey" for this pay period since Defendants' payroll records do not contain any entries for Parshey. *Id.* Parshey did not testify. The lack of evidence about whether Parshey was paid is insufficient to prove that he was not paid. Accordingly, in assessing the overtime claim, the court only considers evidence and arguments relating to violations that happened during the PAGA penalty period. To the extent that Carter argues Defendants are at fault for not producing time and pay records for work performed after August 3, 2019, he should have made that argument during discovery and has long since waived it.

In making the following findings of facts with respect to Carter's claim for PAGA penalties, the court examines Defendants' payroll records, admitted as Plaintiff's Exhibit 11, and the timesheets for each employee, admitted as the exhibits cited below, unless otherwise noted**.**

### 1. Overtime (Labor Code § 510) for Aggrieved Employees

The parties' submissions regarding the number of overtime hours worked by aggrieved employees are confusing, rife with errors, and only marginally helpful. On Carter's side, it is apparent that he calculated overtime hours using the "Overtime 1" column on the employees' timesheets. However, Vepa provided undisputed testimony that the employees' timesheets are only accurate as to the hours worked. He specifically testified that the "Overtime" columns were not accurate, at least for records before February 1, 2019. Thus, Carter's reliance on the undisputedly inaccurate overtime column resulted in significant calculation errors. Defendants, on the other hand, did not seriously attempt to figure out Carter's methodology and provided no alternate calculations for the overtime violations. The parties' failure to conduct accurate and thorough analyses of the records required the court to conduct its own labor-intensive assessment of the aggrieved employee's time and payroll records to make findings of fact regarding Carter's PAGA claim for overtime violations.

As explained in the conclusions of law, overtime under the Labor Code accrues for any time an employee worked more than eight hours in a day. For the reasons explained below, the court holds that Defendants' on-duty meal period policy is unlawful because the undisputed evidence shows that Vepa did not count the on-duty meal period toward hours worked. This means that for the period before February 1, 2019, Vepa paid all employees at their regular hourly

14

rate for the first 9 hours of work in a day, instead of paying overtime for any time worked beyond 8 hours.

For dates prior to February 1, 2019,[9] the court looked at the timesheets for each aggrieved employee and calculated the total number of hours that the employee worked over 8 hours in a day in each pay period, using the decimal figure in the "Hours" column instead of the inaccurate "Overtime 1" column.[10]  The court compared the total number of overtime hours for each pay period to the overtime hours actually paid, as reflected in Defendants' payroll records under the "Premium Hours" column.[11]

For dates after February 1, 2019, the court reviewed the "Time In" and "Time Out" columns to determine whether the employee clocked out for a meal break.  Using the "hours" column, the court counted any on the clock hours in excess of 8 hours per day toward overtime worked for that pay period and compared it to the overtime hours paid for that pay period.

The court finds that 34 employees worked more than 8 hours per day without receiving overtime pay in the following pay periods:

### 1) Decatuer Carter, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 8/7/17-8/20/17 | 1.83 hours | Pl. Ex. 3, JKCC-1810. | .83 hours | Pl. Ex. 4, JKCC-1761. |

---

[9] Defendants started requiring employees to clock out for meal breaks starting on February 1, 2019.

[10] Vepa provided undisputed testimony that the timesheets were accurate as to the "Time In," "Time Out," "Hours," and "Daily Total" columns, with the exception that on some occasions when employees clocked in before 7:00 a.m., he manually changed the "Time In" to 7:00 a.m. Vepa testified that the timesheets accurately reflect the number of hours employees worked apart from those changes.

[11] Vepa testified that Defendants extract data directly from the time sheets into Excel and then enter that data into the payroll system for each employee.  The employees' straight time is entered into the "Reg Hours" column in the payroll records, while overtime is reflected in the "Premium Hours" column.  Vepa testified that the payroll records accurately reflect the number of overtime hours for which employees were paid.

United States District Court
Northern District of California

### 2) Marshal Agharanya, 2 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/21/17-9/3/17 | 6.84 hours | Pl. Ex. 13, JKCC-2102 | 2.92 hours | Pl. Ex. 11, JKCC-2074 |
| 2 | 9/4/17-9/17/17 | 1.83 hours | Pl. Ex. 13, JKCC-2102 | .2 hours | Pl. Ex. 11, JKCC-2074 |

### 3) Alan Alfaro, 10 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 10/30/17-11/12/17 | 4 hours | Pl. Ex. 20, JKCC-2183 | .83 hours | Pl. Ex. 11, JKCC-2074 |
| 2 | 11/13/17-11/26/17 | 10.65 hours | Pl. Ex. 20, JKCC-2183 | 5.67 hours | Pl. Ex. 11, JKCC-2074 |
| 3 | 11/27/17-12/10/17 | 5 hours | Pl. Ex. 20, JKCC-2183 | 1.42 hours | Pl. Ex. 11, JKCC-2074 |
| 4 | 12/11/17-12/24/17 | 7.5 hours | Pl. Ex. 20, JKCC-2183 | 4 hours | Pl. Ex. 11, JKCC-2074 |
| 5 | 12/25/17-1/7/18 | .75 hours | Pl. Ex. 20, JKCC-2183 | 0 hours | Pl. Ex. 11, JKCC-2074 |
| 6 | 1/8/18-1/21/18 | 2.67 hours | Pl. Ex. 20, JKCC-2183 | .92 hours | Pl. Ex. 11, JKCC-2074 |
| 7 | 1/22/18-2/4/18 | 3.25 hours | Pl. Ex. 20, JKCC-2183 | 1.25 hours | Pl. Ex. 11, JKCC-2074 |
| 8 | 2/5/18-2/18/18 | 4.25 hours | Pl. Ex. 20, JKCC-2183 | 1 hour | Pl. Ex. 11, JKCC-2074 |
| 9 | 2/19/18-3/4/18 | 5.66 hours | Pl. Ex. 20, JKCC-2183, JKCC-2184 | 1.83 hours | Pl. Ex. 11, JKCC-2074 |
| 10 | 3/5/18-3/18/18 | 3.42 hours | Pl. Ex. 20, JKCC-2184 | .75 hours | Pl. Ex. 11, JKCC-2074 |

### 4) Gebrielle Amare, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 11/13/17-11/26/17 | 4.91 hours | Pl. Ex. 22, JKCC-2103 | .45 hours | Pl. Ex.11, JKCC-2074 |

### 5) Naod Assefa, 13 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 4/16/18-4/29/18 | 18.39 hours | Pl. Ex. 29, JKCC-2185 | 16.32 hours | Pl. Ex.11, JKCC-2075 |
| 2 | 5/14/18-5/27/18 | 7.78 hours | Pl. Ex. 29, JKCC-2185 | 3.95 hours | Pl. Ex.11, JKCC-2075 |
| 3 | 5/28/18-6/10/18 | 6.66 hours | Pl. Ex. 29, JKCC-2185 | 6.17 hours | Pl. Ex.11, JKCC-2075 |
| 4 | 6/11/18-6/24/18 | 6.08 hours | Pl. Ex. 29, JKCC-2185 | 3.58 hours | Pl. Ex.11, JKCC-2075 |
| 5 | 6/25/18-7/8/18 | 8.17 hours | Pl. Ex. 29, JKCC-2185, JKCC-2186 | 3.83 hours | Pl. Ex.11, JKCC-2075 |
| 6 | 7/9/18-7/22/18 | 3.42 hours | Pl. Ex. 29, | 0 hours | Pl. Ex.11, |

| | | | JKCC-2186 | | JKCC-2075 |
|---|---|---|---|---|---|
| 7 | 7/23/18-8/5/18 | 14.5 hours | Pl. Ex. 29, JKCC-2186 | 9.17 hours | Pl. Ex.11, JKCC-2075 |
| 8 | 8/6/18-8/19/18 | 9.25 hours | Pl. Ex. 29, JKCC-2186 | 5.67 hours | Pl. Ex.11, JKCC-2075 |
| 9 | 8/20/18-9/2/18 | 9.84 hours | Pl. Ex. 29, JKCC-2186 | 5.67 hours | Pl. Ex.11, JKCC-2075 |
| 10 | 9/16/18-9/29/18 | 11.91 hours | Pl. Ex. 29, JKCC-2186 | 4.5 hours | Pl. Ex.11, JKCC-2075 |
| 11 | 9/30/18-10/13/18 | 14.18 hours | Pl. Ex. 29, JKCC-2186, JKCC-2187 | 13.58 hours | Pl. Ex.11, JKCC-2075 |
| 12 | 1/20/19-2/2/19 | 4.92 hours | Pl. Ex. 29, JKCC-2187 | 2 hours | Pl. Ex.11, JKCC-2075 |
| 13 | 2/17/19-3/2/19 | 4.33 hours | Pl. Ex. 29, JKCC-2187 | 2.17 hours | Pl. Ex.11, JKCC-2076 |

6) Christopher Beltre, 25 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 3/5/18-3/18/18 | 1.92 hours | Pl. Ex. 34, JKCC-2105 | .25 hours | Pl. Ex. 11, JKCC-2077 |
| 2 | 3/19/18-4/1/18 | 2.92 hours | Pl. Ex. 34, JKCC-2105 | 1 hour | Pl. Ex. 11, JKCC-2077 |
| 3 | 4/2/18-4/15/18 | 2.75 hours | Pl. Ex. 34, JKCC-2105 | .5 hours | Pl. Ex. 11, JKCC-2077 |
| 4 | 4/16/18-4/29/18 | 10.92 hours | Pl. Ex. 34, JKCC-2105 | 5.92 hours | Pl. Ex. 11, JKCC-2077 |
| 5 | 5/14/18-5/27/18 | 5 hours | Pl. Ex. 34, JKCC-2105 | 1.08 hours | Pl. Ex. 11, JKCC-2077 |
| 6 | 5/28/18-6/10/18 | 8.51 hours | Pl. Ex. 34, JKCC-2105 | 3.92 hours | Pl. Ex. 11, JKCC-2077 |
| 7 | 6/11/18-6/24/18 | 7.34 hours | Pl. Ex. 34, JKCC-2105 | 2.33 hours | Pl. Ex. 11, JKCC-2077 |
| 8 | 6/25/18-7/8/18 | 11.84 hours | Pl. Ex. 34, JKCC-2105, JKCC-2106 | 4.5 hours | Pl. Ex. 11, JKCC-2077 |
| 9 | 7/9/18-7/22/18 | 9.26 hours | Pl. Ex. 34, JKCC-2106 | 2.92 hours | Pl. Ex. 11, JKCC-2077 |
| 10 | 7/23/18-8/5/18 | 12.9 hours | Pl. Ex. 34, JKCC-2106 | 8.75 hours | Pl. Ex. 11, JKCC-2077 |
| 11 | 8/6/18-8/19/18 | 9.82 hours | Pl. Ex. 34, JKCC-2106 | 5.08 hours | Pl. Ex. 11, JKCC-2077 |
| 12 | 8/20/18-9/2/18 | 9.08 hours | Pl. Ex. 34, JKCC-2106 | 4.17 hours | Pl. Ex. 11, JKCC-2077 |
| 13 | 9/3/18-9/15/18 | 6.33 hours | Pl. Ex. 34, JKCC-2106 | 3.2 hours | Pl. Ex. 11, JKCC-2077 |
| 14 | 9/16/18-9/29/18 | 6.67 hours | Pl. Ex. 34, JKCC-2106 | 1.15 hours | Pl. Ex. 11, JKCC-2077 |
| 15 | 9/30/18-10/13/18 | 8.84 hours | Pl. Ex. 34, JKCC-2107 | 4.17 hours | Pl. Ex. 11, JKCC-2077 |
| 16 | 10/14/18-10/27/18 | 4.42 hours | Pl. Ex. 34, JKCC-2107 | 1.42 hours | Pl. Ex. 11, JKCC-2077 |
| 17 | 10/28/18-11/10/18 | 10.67 hours | Pl. Ex. 34, JKCC-2107 | 6.5 hours | Pl. Ex. 11, JKCC-2077 |

| 18 | 11/11/18-11/24/18 | 8.84 hours | Pl. Ex. 34, JKCC-2107 | 3.83 hours | Pl. Ex. 11, JKCC-2077 |
| 19 | 11/25/18-12/8/18 | 8.33 hours | Pl. Ex. 34, JKCC-2107 | 4.33 hours | Pl. Ex. 11, JKCC-2077 |
| 20 | 12/9/18-12/22/18 | 4.5 hours | Pl. Ex. 34, JKCC-2107 | 1.5 hours | Pl. Ex. 11, JKCC-2077 |
| 21 | 12/23/18-1/5/19 | 9.34 hours | Pl. Ex. 34, JKCC-2107 | 3.77 hours | Pl. Ex. 11, JKCC-2077 |
| 22 | 1/6/19-1/19/19 | 3.33 hours | Pl. Ex. 34, JKCC-2107, JKCC-2108 | 1.08 hours | Pl. Ex. 11, JKCC-2077 |
| 23 | 1/20/19-2/2/19 | 4.67 hours | Pl. Ex. 34, JKCC-2108 | 2.42 hours | Pl. Ex. 11, JKCC-2077 |
| 24 | 2/3/19-2/16/19 | 0.16 hours | Pl. Ex. 34, JKCC-2108 | 0 hours | Pl. Ex. 11, JKCC-2077 |
| 25 | 2/17/19-3/2/19 | 1.0 hour | Pl. Ex. 34, JKCC-2108 | 0 hours | Pl. Ex. 11, JKCC-2077 |

7) Dijon Benefield, 21 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 10/16/17-10/29/17 | 13.67 hours | Pl. Ex. 38, JKCC-2190 | 6.17 hours | Pl. Ex. 11, JKCC-2078 |
| 2 | 10/30/17-11/12/17 | 12.04 hours | Pl. Ex. 38, JKCC-2190 | 12 hours | Pl. Ex. 11, JKCC-2078 |
| 3 | 11/13/17-11/26/17 | 10.91 hours | Pl. Ex. 38, JKCC-2190 | 5.42 hours | Pl. Ex. 11, JKCC-2078 |
| 4 | 11/27/17-12/10/17 | 10.24 hours | Pl. Ex. 38, JKCC-2190 | 6.16 hours | Pl. Ex. 11, JKCC-2078 |
| 5 | 12/11/17-12/24/17 | 7.5 hours | Pl. Ex. 38, JKCC-2190 | 2.75 hours | Pl. Ex. 11, JKCC-2078 |
| 6 | 12/25/17-1/7/18 | 5.5 hours | Pl. Ex. 38, JKCC-2190, JKCC-2191 | 1.92 hours | Pl. Ex. 11, JKCC-2078 |
| 7 | 1/8/18-1/21/18 | 8.09 hours | Pl. Ex. 38, JKCC-2191 | 0 hours | Pl. Ex. 11, JKCC-2078 |
| 8 | 2/5/18-2/18/18 | 5 hours | Pl. Ex. 38, JKCC-2191 | 2 hours | Pl. Ex. 11, JKCC-2078 |
| 9 | 2/19/18-3/4/18 | 9.33 hours | Pl. Ex. 38, JKCC-2191 | 4.25 hours | Pl. Ex. 11, JKCC-2078 |
| 10 | 3/5/18-3/18/18 | 1.75 hours | Pl. Ex. 38, JKCC-2191 | .08 hours | Pl. Ex. 11, JKCC-2078 |
| 11 | 3/19/18-4/1/18 | 2.16 hours | Pl. Ex. 38, JKCC-2191 | .1 hours | Pl. Ex. 11, JKCC-2078 |
| 12 | 4/2/18-4/15/18 | 5.92 hours | Pl. Ex. 38, JKCC-2192 | 1.92 hours | Pl. Ex. 11, JKCC-2078 |
| 13 | 4/16/18-4/29/18 | 17.26 hours | Pl. Ex. 38, JKCC-2192 | 10.25 hours | Pl. Ex. 11, JKCC-2078 |
| 14 | 5/14/18-5/27/18 | 5 hours | Pl. Ex. 38, JKCC-2192 | 2 hours | Pl. Ex. 11, JKCC-2078 |
| 15 | 5/28/18-6/10/18 | 12.33 hours | Pl. Ex. 38, JKCC-2192 | 7 hours | Pl. Ex. 11, JKCC-2078 |
| 16 | 6/11/18-6/24/18 | 9.42 hours | Pl. Ex. 38, JKCC-2192, JKCC-2193 | 4.42 hours | Pl. Ex. 11, JKCC-2078 |

| 17 | 6/25/18-7/8/18 | 9.43 hours | Pl. Ex. 38, JKCC-2193 | 3.25 hours | Pl. Ex. 11, JKCC-2078 |
| 18 | 7/9/18-7/22/18 | 3.58 hours | Pl. Ex. 38, JKCC-2193 | .5 hours | Pl. Ex. 11, JKCC-2078 |
| 19 | 7/23/18-8/5/18 | 9.57 hours | Pl. Ex. 38, JKCC-2193 | 4.25 hours | Pl. Ex. 11, JKCC-2078 |
| 20 | 8/6/18-8/19/18 | 10.92 hours | Pl. Ex. 38, JKCC-2193 | 4.75 hours | Pl. Ex. 11, JKCC-2079 |
| 21 | 8/20/18-9/2/18 | 1.25 hours | Pl. Ex. 38, JKCC-2193 | 0 hours | Pl. Ex. 11, JKCC-2079 |

8) Brook Berhanu, 18 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 3/19/18-4/1/18 | 5.75 hours | Pl. Ex. 42, JKCC-2113 | 1.67 hours | Pl. Ex. 11, JKCC-2079 |
| 2 | 4/2/18-4/15/18 | 9.09 hours | Pl. Ex. 42, JKCC-2113 | 7.83 hours | Pl. Ex. 11, JKCC-2079 |
| 3 | 5/14/18-5/27/18 | 7.33 hours | Pl. Ex. 42, JKCC-2113 | 3.33 hours | Pl. Ex. 11, JKCC-2079 |
| 4 | 5/28/18-6/10/18 | 9.16 hours | Pl. Ex. 42, JKCC-2114 | 4.08 hours | Pl. Ex. 11, JKCC-2079 |
| 5 | 6/11/18-6/24/18 | 4.17 hours | Pl. Ex. 42, JKCC-2114 | 1 hour | Pl. Ex. 11, JKCC-2079 |
| 6 | 7/9/18-7/22/18 | 12.76 hours | Pl. Ex. 42, JKCC-2114 | 4.92 hours | Pl. Ex. 11, JKCC-2079 |
| 7 | 7/23/18-8/5/18 | 15.25 hours | Pl. Ex. 42, JKCC-2114 | 6.83 hours | Pl. Ex. 11, JKCC-2079 |
| 8 | 8/6/18-8/19/18 | 3.25 hours | Pl. Ex. 42, JKCC-2115 | .5 hours | Pl. Ex. 11, JKCC-2079 |
| 9 | 8/20/18-9/2/18 | 6.5 hours | Pl. Ex. 42, JKCC-2115 | 2.25 hours | Pl. Ex. 11, JKCC-2079 |
| 10 | 9/3/18-9/15/18 | 10.24 hours | Pl. Ex. 42, JKCC-2115 | 10.15 hours | Pl. Ex. 11, JKCC-2079 |
| 11 | 9/16/18-9/29/18 | 10.92 hours | Pl. Ex. 42, JKCC-2115 | 3.15 hours | Pl. Ex. 11, JKCC-2079 |
| 12 | 10/28/18-11/10/18 | 14.45 hours | Pl. Ex. 42, JKCC-2115, JKCC-2116 | 12.60 hours | Pl. Ex. 11, JKCC-2079 |
| 13 | 11/11/18-11/24/18 | 3.08 hours | Pl. Ex. 42, JKCC-2116 | 1.75 hours | Pl. Ex. 11, JKCC-2079 |
| 14 | 11/25/18-12/8/18 | 5.28 hours | Pl. Ex. 42, JKCC-2116 | 2.28 hours | Pl. Ex. 11, JKCC-2079 |
| 15 | 12/9/18-12/22/18 | 6.83 hours | Pl. Ex. 42, JKCC-2116 | 1.25 hours | Pl. Ex. 11, JKCC-2079 |
| 16 | 12/23/18-1/5/19 | 4.25 hours | Pl. Ex. 42, JKCC-2116 | 4 hours | Pl. Ex. 11, JKCC-2079 |
| 17 | 1/6/19-1/19/19 | 5.42 hours | Pl. Ex. 42, JKCC-2116 | 1.67 hours | Pl. Ex. 11, JKCC-2080 |
| 18 | 2/3/19-2/16/19 | 0.83 hours | Pl. Ex. 42, JKCC-2116, JKCC-2117 | 0 hours | Pl. Ex. 11, JKCC-2080 |

9) Kamani Campbell, 9 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 4/16/18-4/29/18 | 5.91 hours | Pl. Ex. 49, JKCC-2194 | 2.92 hours | Pl. Ex. 11, JKCC-2080 |
| 2 | 4/30/18-5/13/18 | 12 hours | Pl. Ex. 49, JKCC-2194 | 4.75 hours | Pl. Ex. 11, JKCC-2080 |
| 3 | 5/14/18-5/27/18 | 6.92 hours | Pl. Ex. 49, JKCC-2194 | 3.08 hours | Pl. Ex. 11, JKCC-2080 |
| 4 | 5/28/18-6/10/18 | 7.17 hours | Pl. Ex. 49, JKCC-2194 | 3.25 hours | Pl. Ex. 11, JKCC-2080 |
| 5 | 6/11/18-6/24/18 | 10.09 hours | Pl. Ex. 49, JKCC-2194 | 3.67 hours | Pl. Ex. 11, JKCC-2080 |
| 6 | 6/25/18-7/8/18 | 11.5 hours | Pl. Ex. 49, JKCC-2194, | 5.33 hours | Pl. Ex. 11, JKCC-2080 |
| 7 | 7/9/18-7/22/18 | 10.75 hours | Pl. Ex. 49, JKCC-2194 JKCC-2195 | 4.17 hours | Pl. Ex. 11, JKCC-2080 |
| 8 | 7/23/18-8/5/18 | 12.17 hours | Pl. Ex. 49, JKCC-2195 | 8.08 hours | Pl. Ex. 11, JKCC-2080 |
| 9 | 8/6/18-8/19/18 | 6.17 hours | Pl. Ex. 49, JKCC-2195 | 4.17 hours | Pl. Ex. 11, JKCC-2080 |

10) Serverino Cortez, 30 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 8/7/17-8/20/17 | 3.84 hours | Pl. Ex. 54, JKCC-2197 | 0 hours | Pl. Ex. 11, JKCC-2081 |
| 2 | 8/21/17-9/3/17 | 3.17 hours | Pl. Ex. 54, JKCC-2197 | .67 hours | Pl. Ex. 11, JKCC-2081 |
| 3 | 11/13/17-11/26/17 | 8.08 hours | Pl. Ex. 54, JKCC-2198 | 5 hours | Pl. Ex. 11, JKCC-2081 |
| 4 | 11/27/17-12/10/17 | 10.99 hours | Pl. Ex. 54, JKCC-2198 | 5.67 hours | Pl. Ex. 11, JKCC-2081 |
| 5 | 12/11/17-12/24/17 | 11.17 hours | Pl. Ex. 54, JKCC-2198 | 5.25 hours | Pl. Ex. 11, JKCC-2081 |
| 6 | 12/25/17-1/7/18 | 7.33 hours | Pl. Ex. 54, JKCC-2198 | 3.25 hours | Pl. Ex. 11, JKCC-2081 |
| 7 | 1/8/18-1/21/18 | 4.74 hours | Pl. Ex. 54, JKCC-2198 | 1.33 hours | Pl. Ex. 11, JKCC-2081 |
| 8 | 1/22/18-2/4/18 | 11.5 hours | Pl. Ex. 54, JKCC-2198 | 6.08 hours | Pl. Ex. 11, JKCC-2081 |
| 9 | 2/5/18-2/18/18 | 11.5 hours | Pl. Ex. 54, JKCC-2198 | 6.42 hours | Pl. Ex. 11, JKCC-2081 |
| 10 | 2/19/18-3/4/18 | 10.58 hours | Pl. Ex. 54, JKCC-2199 | 5.08 hours | Pl. Ex. 11, JKCC-2081 |
| 11 | 3/5/18-3/18/18 | 11.59 hours | Pl. Ex. 54, JKCC-2199 | 4.58 hours | Pl. Ex. 11, JKCC-2081 |
| 12 | 3/19/18-4/1/18 | 6.25 hours | Pl. Ex. 54, JKCC-2199 | 3.17 hours | Pl. Ex. 11, JKCC-2081 |
| 13 | 4/2/18-4/15/18 | 17.4 hours | Pl. Ex. 54, JKCC-2199 | 9.83 hours | Pl. Ex. 11, JKCC-2081 |
| 14 | 4/16/18-4/29/18 | 11.66 hours | Pl. Ex. 54, JKCC-2199 | 6.50 hours | Pl. Ex. 11, JKCC-2081 |
| 15 | 4/30/18-5/13/18 | 7 hours | Pl. Ex. 54, | 3.42 hours | Pl. Ex. 11, |

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| | | | JKCC-2199 | | JKCC-2081 |
| 16 | 5/14/18-5/27/18 | 3.09 hours | Pl. Ex. 54, JKCC-2199 | 1.17 hours | Pl. Ex. 11, JKCC-2081 |
| 17 | 5/28/18-6/10/18 | 13.75 hours | Pl. Ex. 54, JKCC-2199 | 8 hours | Pl. Ex. 11, JKCC-2081 |
| 18 | 6/11/18-6/24/18 | 14.16 hours | Pl. Ex. 54, JKCC-2200 | 7.17 hours | Pl. Ex. 11, JKCC-2081 |
| 19 | 8/6/18-8/19/18 | 11.99 hours | Pl. Ex. 54, JKCC-2200 | 5.75 hours | Pl. Ex. 11, JKCC-2081 |
| 20 | 8/20/18-9/2/18 | 5.33 hours | Pl. Ex. 54, JKCC-2200 | 1.92 hours | Pl. Ex. 11, JKCC-2082 |
| 21 | 9/3/18-9/15/18 | 17.99 hours | Pl. Ex. 54, JKCC-2200 | 11.63 hours | Pl. Ex. 11, JKCC-2082 |
| 22 | 9/16/18-9/29/18 | 11.67 hours | Pl. Ex. 54, JKCC-2200 | 3.40 hours | Pl. Ex. 11, JKCC-2082 |
| 23 | 9/30/18-10/13/18 | 14.67 hours | Pl. Ex. 54, JKCC-2200 | 7.50 hours | Pl. Ex. 11, JKCC-2082 |
| 24 | 10/14/18-10/27/18 | 14.73 hours | Pl. Ex. 54, JKCC-2201 | 7.42 hours | Pl. Ex. 11, JKCC-2082 |
| 25 | 10/28/18-11/10/18 | 6.74 hours | Pl. Ex. 54, JKCC-2201 | 2.75 hours | Pl. Ex. 11, JKCC-2082 |
| 26 | 11/11/18-11/24/18 | 13.75 hours | Pl. Ex. 54, JKCC-2201 | 7.83 hours | Pl. Ex. 11, JKCC-2082 |
| 27 | 11/25/18-12/8/18 | 14.01 hours | Pl. Ex. 54, JKCC-2201 | 7 hours | Pl. Ex. 11, JKCC-2082 |
| 28 | 12/9/18-12/22/18 | 11 hours | Pl. Ex. 54, JKCC-2201 | 5.67 hours | Pl. Ex. 11, JKCC-2082 |
| 29 | 12/23/18-1/5/19 | 6.75 hours | Pl. Ex. 54, JKCC-2201 | 1.92 hours | Pl. Ex. 11, JKCC-2082 |
| 30 | 1/6/19-1/19/19 | 7.91 hours | Pl. Ex. 54, JKCC-2201 | 3.83 hours | Pl. Ex. 11, JKCC-2082 |

11) Andrew Crowder, 10 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | .75 hours | Pl. Ex. 61, JKCC-2126 | 0 hours | Pl. Ex. 11, JKCC-2082 |
| 2 | 8/21/17-9/3/17 | 5.99 hours | Pl. Ex. 61, JKCC-2126 | 2.33 hours | Pl. Ex. 11, JKCC-2082 |
| 3 | 9/4/17-9/17/17 | 3.9 hours | Pl. Ex. 61, JKCC-2126 | .92 hours | Pl. Ex. 11, JKCC-2082 |
| 4 | 9/18/17-10/1/17 | 6.51 hours | Pl. Ex. 61, JKCC-2126 | 2.25 hours | Pl. Ex. 11, JKCC-2082 |
| 5 | 10/2/17-10/15/17 | 4.66 hours | Pl. Ex. 61, JKCC-2126 | 1.58 hours | Pl. Ex. 11, JKCC-2082 |
| 6 | 10/16/17-10/29/17 | 7.33 hours | Pl. Ex. 61, JKCC-2126 | 1.92 hours | Pl. Ex. 11, JKCC-2082 |
| 7 | 10/30/17-11/12/17 | 4 hours | Pl. Ex. 61, JKCC-2126 | 1.08 hours | Pl. Ex. 11, JKCC-2082 |
| 8 | 11/13/17-11/26/17 | 6 hours | Pl. Ex. 61, JKCC-2127 | 2.58 hours | Pl. Ex. 11, JKCC-2082 |
| 9 | 11/27/17-12/10/17 | 7.58 hours | Pl. Ex. 61, JKCC-2127 | 3.08 hours | Pl. Ex. 11, JKCC-2082 |
| 10 | 12/11/17-12/24/17 | 3.25 hours | Pl. Ex. 61, JKCC-2127 | 1.25 hours | Pl. Ex. 11, JKCC-2082 |

United States District Court
Northern District of California

21

12) Luis Dominguez, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 2/17/19-3/2/19 | 5.83 hours | Pl. Ex. 63, JKCC-2203 | 5.5 hours | Pl. Ex. 11, JKCC-2083 |

13) Michael Embaye, 3 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 3/19/18-4/1/18 | 4 hours | Pl. Ex. 67, JKCC-2128 | 1.25 hours | Pl. Ex. 11, JKCC-2083 |
| 2 | 4/2/18-4/15/18 | 1.42 hours | Pl. Ex. 67, JKCC-2128 | 0 hours | Pl. Ex. 11, JKCC-2083 |
| 3 | 4/16/18-4/29/18 | 3.92 hours | Pl. Ex. 67, JKCC-2128 | 2.08 hours | Pl. Ex. 11, JKCC-2083 |

14) Joshua Epps, 3 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 1/6/19-1/19/19 | 5.25 hours | Pl. Ex. 69, JKCC-2205 | 2.25 hours | Pl. Ex. 11, JKCC-2083 |
| 2 | 2/3/19-2/16/19 | 1.17 hours | Pl. Ex. 69, JKCC-2205 | 0 hours | Pl. Ex. 11, JKCC-2083 |
| 3 | 2/17/19-3/2/19 | 6.25 hours | Pl. Ex. 69, JKCC-2205, JKCC-2206 | 4.58 hours | Pl. Ex. 11, JKCC-2083 |

15) Tominiko Fonohema, 16 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 9.83 hours | Plft. Ex. 71, JKCC-2129, JKCC-2130 | 7.5 hours | Pl. Ex. 11, JKCC-2084 |
| 2 | 8/21/17-9/3/17 | 5.42 hours | Plft. Ex. 71, JKCC-2130 | 2.25 hours | Pl. Ex. 11, JKCC-2084 |
| 3 | 9/4/17-9/17/17 | 1.58 hours | Plft. Ex. 71, JKCC-2130 | 0 hours | Pl. Ex. 11, JKCC-2084 |
| 4 | 10/2/17-10/15/17 | 7.99 hours | Plft. Ex. 71, JKCC-2130 | 2.17 hours | Pl. Ex. 11, JKCC-2084 |
| 5 | 11/13/17-11/26/17 | 6.51 hours | Plft. Ex. 71, JKCC-2131 | 2.33 hours | Pl. Ex. 11, JKCC-2084 |
| 6 | 11/27/17-12/10/17 | 7.16 hours | Plft. Ex. 71, JKCC-2131 | 2.08 hours | Pl. Ex. 11, JKCC-2084 |
| 7 | 12/11/17-12/24/17 | 4.42 hours | Plft. Ex. 71, JKCC-2131 | 1.17 hours | Pl. Ex. 11, JKCC-2084 |
| 8 | 12/25/17-1/7/18 | 9.76 hours | Plft. Ex. 71, JKCC-2131, JKCC-2132 | 5.58 hours | Pl. Ex. 11, JKCC-2084 |
| 9 | 1/8/18-1/21/18 | 5.67 hours | Plft. Ex. 71, JKCC-2132 | 4.67 hours | Pl. Ex. 11, JKCC-2084 |
| 10 | 1/22/18-2/4/18 | 7.34 hours | Plft. Ex. 71, JKCC-2132 | 2 hours | Pl. Ex. 11, JKCC-2084 |
| 11 | 2/5/18-2/18/18 | 3 hours | Plft. Ex. 71, JKCC-2132 | 0 hours | Pl. Ex. 11, JKCC-2084 |

| 12 | 2/19/18-3/4/18 | 10.25 hours | Plft. Ex. 71, JKCC-2132 | 3.25 hours | Pl. Ex. 11, JKCC-2084 |
| 13 | 3/5/18-3/18/18 | 12.25 hours | Plft. Ex. 71, JKCC-2132 | 4.5 hours | Pl. Ex. 11, JKCC-2084 |
| 14 | 3/19/18-4/1/18 | 4.58 hours | Plft. Ex. 71, JKCC-2132, JKCC-2133 | .5 hours | Pl. Ex. 11, JKCC-2084 |
| 15 | 4/2/18-4/15/18 | 9.08 hours | Plft. Ex. 71, JKCC-2133 | 7.92 hours | Pl. Ex. 11, JKCC-2085 |
| 16 | 4/16/18-4/29/18 | 3.58 hours | Plft. Ex. 71, JKCC-2133 | .58 hours | Pl. Ex. 11, JKCC-2085 |

16) Quincy Franklin, 13 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 7/23/18-8/5/18 | 14.49 hours | Pl. Ex. 75, JKCC-2210 | 10.25 hours | Pl. Ex. 11, JKCC-2085 |
| 2 | 8/6/18-8/19/18 | 8.42 hours | Pl. Ex. 75, JKCC-2210 | 3.5 hours | Pl. Ex. 11, JKCC-2085 |
| 3 | 8/20/18-9/2/18 | 14.5 hours | Pl. Ex. 75, JKCC-2210 | 7 hours | Pl. Ex. 11, JKCC-2085 |
| 4 | 9/30/18-10/13/18 | 13.18 hours | Pl. Ex. 75, JKCC-2210-JKCC-2211 | 6.33 hours | Pl. Ex. 11, JKCC-2085 |
| 5 | 10/14/18-10/27/18 | 8.92 hours | Pl. Ex. 75, JKCC-2211 | 8.83 hours | Pl. Ex. 11, JKCC-2085 |
| 6 | 10/28/18-11/10/18 | 13.93 hours | Pl. Ex. 75, JKCC-2211 | 6.17 hours | Pl. Ex. 11, JKCC-2085 |
| 7 | 11/11/18-11/24/18 | 11.58 hours | Pl. Ex. 75, JKCC-2211 | 5.42 hours | Pl. Ex. 11, JKCC-2085 |
| 8 | 11/25/18-12/8/18 | 15.43 hours | Pl. Ex. 75, JKCC-2211 | 8.5 hours | Pl. Ex. 11, JKCC-2085 |
| 9 | 12/9/18-12/22/18 | 8 hours | Pl. Ex. 75, JKCC-2211, JKCC-2212 | 3.25 hours | Pl. Ex. 11, JKCC-2085 |
| 10 | 12/23/18-1/5/19 | 3.49 hours | Pl. Ex. 75, JKCC-2212 | .17 hours | Pl. Ex. 11, JKCC-2085 |
| 11 | 1/6/19-1/19/19 | 8.41 hours | Pl. Ex. 75, JKCC-2212 | 1.83 hours | Pl. Ex. 11, JKCC-2085 |
| 12 | 1/20/19-2/2/19 | 8.58 hours | Pl. Ex. 75, JKCC-2212 | 4.92 hours | Pl. Ex. 11, JKCC-2085 |
| 13 | 2/3/19-2/16/19 | 0.84 hours | Pl. Ex. 75, JKCC-2212, JKCC-2213 | 0 hours | Pl. Ex. 11, JKCC-2085 |

17) Donald Gradford, 33 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 10/16/17-10/29/17 | 11.26 hours | Pl. Ex. 79, JKCC-2134 | 10.58 hours | Pl. Ex. 11, JKCC-2086 |
| 2 | 10/30/17-11/12/17 | 16.48 hours | Pl. Ex. 79, JKCC-2134 | 15.58 hours | Pl. Ex. 11, JKCC-2086 |
| 3 | 11/13/17-11/26/17 | 13.67 hours | Pl. Ex. 79, JKCC-2134 | 6.83 hours | Pl. Ex. 11, JKCC-2086 |
| 4 | 11/27/17-12/10/17 | 19 hours | Pl. Ex. 79, | 9.25 hours | Pl. Ex. 11, |

United States District Court
Northern District of California

|  |  |  |  | JKCC-2134, JKCC-2135 |  | JKCC-2086 |
|---|---|---|---|---|---|---|
| 5 | 12/11/17-12/24/17 | 7.17 hours | | Pl. Ex. 79, JKCC-2135 | 2.25 hours | Pl. Ex. 11, JKCC-2086 |
| 6 | 12/25/17-1/7/18 | 10.84 hours | | Pl. Ex. 79, JKCC-2135 | 4.33 hours | Pl. Ex. 11, JKCC-2086 |
| 7 | 1/8/18-1/21/18 | 8.17 hours | | Pl. Ex. 79, JKCC-2135 | 3.25 hours | Pl. Ex. 11, JKCC-2086 |
| 8 | 1/22/18-2/4/18 | 17.17 hours | | Pl. Ex. 79, JKCC-2135 | 8.42 hours | Pl. Ex. 11, JKCC-2086 |
| 9 | 2/5/18-2/18/18 | 12.68 hours | | Pl. Ex. 79, JKCC-2135 | 8 hours | Pl. Ex. 11, JKCC-2086 |
| 10 | 2/19/18-3/4/18 | 11 hours | | Pl. Ex. 79, JKCC-2135, JKCC-2136 | 4.08 hours | Pl. Ex. 11, JKCC-2086 |
| 11 | 3/5/18-3/18/18 | 17.08 hours | | Pl. Ex. 79, JKCC-2136 | 12.08 hours | Pl. Ex. 11, JKCC-2086 |
| 12 | 3/19/18-4/1/18 | 11.59 hours | | Pl. Ex. 79, JKCC-2136 | 4.33 hours | Pl. Ex. 11, JKCC-2086 |
| 13 | 4/2/18-4/15/18 | 15.08 hours | | Pl. Ex. 79, JKCC-2136 | 14.75 hours | Pl. Ex. 11, JKCC-2086 |
| 14 | 4/16/18-4/29/18 | 24.16 hours | | Pl. Ex. 79, JKCC-2136 | 22.75 hours | Pl. Ex. 11, JKCC-2086 |
| 15 | 4/30/18-5/13/18 | 19.16 hours | | Pl. Ex. 79, JKCC-2136, JKCC-2137 | 10.42 hours | Pl. Ex. 11, JKCC-2086 |
| 16 | 5/14/18-5/27/18 | 11.24 hours | | Pl. Ex. 79, JKCC-2137 | 3.25 hours | Pl. Ex. 11, JKCC-2086 |
| 17 | 5/28/18-6/10/18 | 19.08 hours | | Pl. Ex. 79, JKCC-2137 | 11 hours | Pl. Ex. 11, JKCC-2086 |
| 18 | 6/11/18-6/24/18 | 16.08 hours | | Pl. Ex. 79, JKCC-2137 | 7 hours | Pl. Ex. 11, JKCC-2086 |
| 19 | 6/25/18-7/8/18 | 19.66 hours | | Pl. Ex. 79, JKCC-2137 | 10.83 hours | Pl. Ex. 11, JKCC-2086 |
| 20 | 7/9/18-7/22/18 | 16.91 hours | | Pl. Ex. 79, JKCC-2137, JKCC-2138 | 7.92 hours | Pl. Ex. 11, JKCC-2086 |
| 21 | 7/23/18-8/5/18 | 27.5 hours | | Pl. Ex. 79, JKCC-2138 | 26.5 hours | Pl. Ex. 11, JKCC-2086 |
| 22 | 8/6/18-8/19/18 | 18.67 hours | | Pl. Ex. 79, JKCC-2138 | 11.67 hours | Pl. Ex. 11, JKCC-2086 |
| 23 | 8/20/18-9/2/18 | 20.07 hours | | Pl. Ex. 79, JKCC-2138 | 10.5 hours | Pl. Ex. 11, JKCC-2086 |
| 24 | 9/3/18-9/15/18 | 16.25 hours | | Pl. Ex. 79, JKCC-2138 | 8.15 hours | Pl. Ex. 11, JKCC-2086 |
| 25 | 9/30/18-10/13/18 | 17.83 hours | | Pl. Ex. 79, JKCC-2139 | 7.83 hours | Pl. Ex. 11, JKCC-2087 |
| 26 | 10/14/18-10/27/18 | 15.58 hours | | Pl. Ex. 79, JKCC-2139 | 7.5 hours | Pl. Ex. 11, JKCC-2087 |
| 27 | 10/28/18-11/10/18 | 16.17 hours | | Pl. Ex. 79, JKCC-2139 | 7.83 hours | Pl. Ex. 11, JKCC-2087 |
| 28 | 11/11/18-11/24/18 | 10.16 hours | | Pl. Ex. 79, JKCC-2139 | 5.17 hours | Pl. Ex. 11, JKCC-2087 |
| 29 | 11/25/18-12/8/18 | 16.58 hours | | Pl. Ex. 79, JKCC-2139, | 8.5 hours | Pl. Ex. 11, JKCC-2087 |

24

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| | | | JKCC-2140 | | |
| 30 | 12/9/18-12/22/18 | 15.76 hours | Pl. Ex. 79, JKCC-2140 | 7.75 hours | Pl. Ex. 11, JKCC-2087 |
| 31 | 12/23/18-1/5/19 | 11 hours | Pl. Ex. 79, JKCC-2140 | 5.75 hours | Pl. Ex. 11, JKCC-2087 |
| 32 | 1/6/19-1/19/19 | 13.83 hours | Pl. Ex. 79, JKCC-2140 | 6.83 hours | Pl. Ex. 11, JKCC-2087 |
| 33 | 2/3/19-2/16/19 | .84 hours | Pl. Ex. 79, JKCC-2140, JKCC-2141 | 0 hours | Pl. Ex. 11, JKCC-2087 |

18) Alauna Helu Jr.: 39 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 15.08 hours | Pl. Ex. 84, JKCC-2219 | 15 hours | Pl. Ex. 11, JKCC-2087 |
| 2 | 8/21/17-9/3/17 | 17.59 hours | Pl. Ex. 84, JKCC-2219, JKCC-2220 | 17.08 hours | Pl. Ex. 11, JKCC-2087 |
| 3 | 9/4/17-9/17/17 | 7.4 hours | Pl. Ex. 84, JKCC-2220 | 6.50 hours | Pl. Ex. 11, JKCC-2087 |
| 4 | 9/18/17-10/1/17 | 6.99 hours | Pl. Ex. 84, JKCC-2220 | 2.08 hours | Pl. Ex. 11, JKCC-2087 |
| 5 | 10/2/17-10/15/17 | 4.75 hours | Pl. Ex. 84, JKCC-2220 | 1.75 hours | Pl. Ex. 11, JKCC-2088 |
| 6 | 10/16/17-10/29/17 | 7.76 hours | Pl. Ex. 84, JKCC-2220 | 3.17 hours | Pl. Ex. 11, JKCC-2088 |
| 7 | 10/30/17-11/12/17 | 10.83 hours | Pl. Ex. 84, JKCC-2220 | 4.42 hours | Pl. Ex. 11, JKCC-2088 |
| 8 | 11/13/17-11/26/17 | 6.08 hours | Pl. Ex. 84, JKCC-2221 | 2.25 hours | Pl. Ex. 11, JKCC-2088 |
| 9 | 11/27/17-12/10/17 | 8.25 hours | Pl. Ex. 84, JKCC-2221 | 2.33 hours | Pl. Ex. 11, JKCC-2088 |
| 10 | 12/11/17-12/24/17 | 5.75 hours | Pl. Ex. 84, JKCC-2221 | 4.17 hours | Pl. Ex. 11, JKCC-2088 |
| 11 | 12/25/17-1/7/18 | 8.24 hours | Pl. Ex. 84, JKCC-2221 | 3.75 hours | Pl. Ex. 11, JKCC-2088 |
| 12 | 1/8/18-1/21/18 | 7.25 hours | Pl. Ex. 84, JKCC-2221 | 2.75 hours | Pl. Ex. 11, JKCC-2088 |
| 13 | 1/22/18-2/4/18 | 8.5 hours | Pl. Ex. 84, JKCC-2221 | 4.33 hours | Pl. Ex. 11, JKCC-2088 |
| 14 | 2/5/18-2/18/18 | 6.5 hours | Pl. Ex. 84, JKCC-2221, JKCC-2222 | 1.58 hours | Pl. Ex. 11, JKCC-2088 |
| 15 | 2/19/18-3/4/18 | 9.99 hours | Pl. Ex. 84, JKCC-2222 | 5.42 hours | Pl. Ex. 11, JKCC-2088 |
| 16 | 3/5/18-3/18/18 | 14.91 hours | Pl. Ex. 84, JKCC-2222 | 6.33 hours | Pl. Ex. 11, JKCC-2088 |
| 17 | 3/19/18-4/1/18 | 4.92 hours | Pl. Ex. 84, JKCC-2222 | 1.55 hours | Pl. Ex. 11, JKCC-2088 |
| 18 | 4/2/18-4/15/18 | 11.91 hours | Pl. Ex. 84, JKCC-2222 | 4.92 hours | Pl. Ex. 11, JKCC-2088 |
| 19 | 4/16/18-4/29/18 | 12.66 hours | Pl. Ex. 84, JKCC-2222, JKCC-2223 | 11.50 hours | Pl. Ex. 11, JKCC-2088 |

| 20 | 4/30/18-5/13/18 | 6.17 hours | Pl. Ex. 84, JKCC-2223 | 1.3 hours | Pl. Ex. 11, JKCC-2088 |
|---|---|---|---|---|---|
| 21 | 5/14/18-5/27/18 | 9.34 hours | Pl. Ex. 84, JKCC-2223 | 8.75 hours | Pl. Ex. 11, JKCC-2088 |
| 22 | 5/28/18-6/10/18 | 10.91 hours | Pl. Ex. 84, JKCC-2223 | 4 hours | Pl. Ex. 11, JKCC-2088 |
| 23 | 6/25/18-7/8/18 | 17.33 hours | Pl. Ex. 84, JKCC-2223 | 9.5 hours | Pl. Ex. 11, JKCC-2088 |
| 24 | 7/9/18-7/22/18 | 12.59 hours | Pl. Ex. 84, JKCC-2223, JKCC-2224 | 5.17 hours | Pl. Ex. 11, JKCC-2088 |
| 25 | 7/23/18-8/5/18 | 16.58 hours | Pl. Ex. 84, JKCC-2224 | 9.91 hours | Pl. Ex. 11, JKCC-2088 |
| 26 | 8/6/18-8/19/18 | 11.16 hours | Pl. Ex. 84, JKCC-2224 | 5.92 hours | Pl. Ex. 11, JKCC-2088 |
| 27 | 8/20/18-9/2/18 | 14.25 hours | Pl. Ex. 84, JKCC-2224 | 6.75 hours | Pl. Ex. 11, JKCC-2088 |
| 28 | 9/3/18-9/15/18 | 15.57 hours | Pl. Ex. 84, JKCC-2224 | 7.35 hours | Pl. Ex. 11, JKCC-2088 |
| 29 | 9/16/18-9/29/18 | 10.07 hours | Pl. Ex. 84, JKCC-2224 | 4.04 hours | Pl. Ex. 11, JKCC-2088 |
| 30 | 9/30/18-10/13/18 | 14.83 hours | Pl. Ex. 84, JKCC-2224, JKCC-2225 | 7.83 hours | Pl. Ex. 11, JKCC-2088 |
| 31 | 10/14/18-10/27/18 | 17.33 hours | Pl. Ex. 84, JKCC-2225 | 9.67 hours | Pl. Ex. 11, JKCC-2088 |
| 32 | 10/28/18-11/10/18 | 17.84 hours | Pl. Ex. 84, JKCC-2225 | 8.33 hours | Pl. Ex. 11, JKCC-2088 |
| 33 | 11/11/18-11/24/18 | 11.08 hours | Pl. Ex. 84, JKCC-2225 | 5.75 hours | Pl. Ex. 11, JKCC-2089 |
| 34 | 11/25/18-12/8/18 | 7.67 hours | Pl. Ex. 84, JKCC-2225 | 5.67 hours | Pl. Ex. 11, JKCC-2089 |
| 35 | 12/9/18-12/22/18 | 13.01 hours | Pl. Ex. 84, JKCC-2225, JKCC-2226 | 7.5 hours | Pl. Ex. 11, JKCC-2089 |
| 36 | 12/23/18-1/5/19 | 5.68 hours | Pl. Ex. 84, JKCC-2226 | 1.75 hours | Pl. Ex. 11, JKCC-2089 |
| 37 | 1/6/19-1/19/19 | 10.24 hours | Pl. Ex. 84, JKCC-2226 | 4.91 hours | Pl. Ex. 11, JKCC-2089 |
| 38 | 2/3/19-2/16/19 | 1.17 hours | Pl. Ex. 84, JKCC-2226 | 0 hours | Pl. Ex. 11, JKCC-2089 |
| 39 | 2/17/19-3/2/19 | 7.57 hours | Pl. Ex. 84, JKCC-2226, JKCC-2227 | 3.33 hours | Pl. Ex. 11, JKCC-2089 |

19) Guillermo Herrera III, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 4/28/19-5/11/19 | 2.83 hours | Pl. Ex 88, JKCC-2147 | 2.5 hours | Pl. Ex. 11, JKCC-2089 |

20) David Hughes, 11 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 2/19/18-3/4/18 | 2.66 hours | Pltf Ex. 93, | .67 hours | Pl. Ex. 11, |

United States District Court
Northern District of California

United States District Court
Northern District of California

| | | | JKCC-2232 | | JKCC-2090 |
|---|---|---|---|---|---|
| 2 | 3/5/18-3/18/18 | 5.42 hours | Pltf Ex. 93, JKCC-2232 | 1.67 hours | Pl. Ex. 11, JKCC-2090 |
| 3 | 3/19/18-4/1/18 | 8.42 hours | Pltf Ex. 93, JKCC-2232 | 3.33 hours | Pl. Ex. 11, JKCC-2090 |
| 4 | 4/2/18-4/15/18 | 6.74 hours | Pltf Ex. 93, JKCC-2232 | 2 hours | Pl. Ex. 11, JKCC-2090 |
| 5 | 4/30/18-5/13/18 | 2.17 hours | Pltf Ex. 93, JKCC-2232 | 1.17 hours | Pl. Ex. 11, JKCC-2090 |
| 6 | 5/14/18-5/27/18 | 3.5 hours | Pltf Ex. 93, JKCC-2232 | .42 hours | Pl. Ex. 11, JKCC-2090 |
| 7 | 5/28/18-6/10/18 | 10.75 hours | Pltf Ex. 93, JKCC-2232, JKCC-2233 | 3 hours | Pl. Ex. 11, JKCC-2090 |
| 8 | 6/11/18-6/24/18 | 7.82 hours | Pltf Ex. 93, JKCC-2233 | 3.25 hours | Pl. Ex. 11, JKCC-2090 |
| 9 | 6/25/18-7/8/18 | 9.41 hours | Pltf Ex. 93, JKCC-2233 | 3.92 hours | Pl. Ex. 11, JKCC-2090 |
| 10 | 7/9/18-7/22/18 | 10.43 hours | Pltf Ex. 93, JKCC-2233 | 3.83 hours | Pl. Ex. 11, JKCC-2090 |
| 11 | 8/6/18-8/19/18 | 3.75 hours | Pltf Ex. 93, JKCC-2233 | 2.75 hours | Pl. Ex. 11, JKCC-2090 |

21) Sione Maile, 16 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 6/25/18-7/8/18 | 15.92 hours | Pl. Ex. 99, JKCC-2151 | 8.17 hours | Pl. Ex. 11, JKCC-2090 |
| 2 | 7/9/18-7/22/18 | 14.91 hours | Pl. Ex. 99, JKCC-2151 | 6.92 hours | Pl. Ex. 11, JKCC-2090 |
| 3 | 7/23/18-8/5/18 | 17.15 hours | Pl. Ex. 99, JKCC-2151 | 10.08 hours | Pl. Ex. 11, JKCC-2090 |
| 4 | 8/6/18-8/19/18 | 14.16 hours | Pl. Ex. 99, JKCC-2151 | 6 hours | Pl. Ex. 11, JKCC-2090 |
| 5 | 8/20/18-9/2/18 | 13.59 hours | Pl. Ex. 99, JKCC-2151 | 6.67 hours | Pl. Ex. 11, JKCC-2090 |
| 6 | 9/3/18-9/15/18 | 17.42 hours | Pl. Ex. 99, JKCC-2151, JKCC-2152 | 10.1 hours | Pl. Ex. 11, JKCC-2090 |
| 7 | 9/16/18-9/29/18 | 10.93 hours | Pl. Ex. 99, JKCC-2152 | 4.04 hours | Pl. Ex. 11, JKCC-2090 |
| 8 | 9/30/18-10/13/18 | 11.91 hours | Pl. Ex. 99, JKCC-2152 | 5.92 hours | Pl. Ex. 11, JKCC-2091 |
| 9 | 10/14/18-10/27/18 | 1 hour | Pl. Ex. 99, JKCC-2152 | 0 hours | Pl. Ex. 11, JKCC-2091 |
| 10 | 10/28/18-11/10/18 | 18.18 hours | Pl. Ex. 99, JKCC-2152 | 18.17 hours | Pl. Ex. 11, JKCC-2091 |
| 11 | 11/11/18-11/24/18 | 12.91 hours | Pl. Ex. 99, JKCC-2152 | 6.92 hours | Pl. Ex. 11, JKCC-2091 |
| 12 | 11/25/18-12/8/18 | 5.83 hours | Pl. Ex. 99, JKCC-2152 | .67 hours | Pl. Ex. 11, JKCC-2091 |
| 13 | 12/9/18-12/22/18 | 3.33 hours | Pl. Ex. 99, JKCC-2152, JKCC-2153 | .08 hours | Pl. Ex. 11, JKCC-2091 |
| 14 | 12/23/18-1/5/19 | 4.41 hours | Pl. Ex. 99, | 1.33 hours | Pl. Ex. 11, |

| | | | JKCC-2153 | | JKCC-2091 |
|---|---|---|---|---|---|
| 15 | 1/6/19-1/19/19 | 8.25 hours | Pl. Ex. 99, JKCC-2153 | 3.75 hours | Pl. Ex. 11, JKCC-2091 |
| 16 | 1/20/19-2/2/19 | .92 hours | Pl. Ex. 99, JKCC-2153 | 0 hours | Pl. Ex. 11, JKCC-2091 |

22) Angel Martinez, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 7/21/19-8/3/19 | 1 hour | Pl. Ex. 101, JKCC-2234 | 0 hours | Pl. Ex. 11, JKCC-2091 |

23) Keith Mayfield, 3 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 4/30/18-5/13/18 | 7.4 hours | Pl. Ex. 103, JKCC-2154 | 2.25 hours | Pl. Ex. 11, JKCC-2091 |
| 2 | 5/14/18-5/27/18 | 2.09 hours | Pl. Ex. 103, JKCC-2154 | .42 hours | Pl. Ex. 11, JKCC-2091 |
| 3 | 5/28/18-6/10/18 | 3.08 hours | Pl. Ex. 103, JKCC-2154 | 1.08 hours | Pl. Ex. 11, JKCC-2091 |

24) Henry McKinley, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/21/17-9/3/17 | 6.33 hours | Pl. Ex. 107, JKCC-2235 | 1.17 hours | Pl. Ex. 11, JKCC-2091 |

25) Mitchell Moore, 42 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 13.35 hours | Pl. Ex. 112, JKCC-2157 | 7.5 hours | Pl. Ex. 11, JKCC-2092 |
| 2 | 8/21/17-9/3/17 | 8.42 hours | Pl. Ex. 112, JKCC-2157, JKCC-2158 | 3 hours | Pl. Ex. 11, JKCC-2092 |
| 3 | 9/4/17-9/17/17 | 5 hours | Pl. Ex. 112, JKCC-2158 | .92 hours | Pl. Ex. 11, JKCC-2092 |
| 4 | 9/18/17-10/1/17 | 11.66 hours | Pl. Ex. 112, JKCC-2158 | 8.33 hours | Pl. Ex. 11, JKCC-2092 |
| 5 | 10/2/17-10/15/17 | 11.5 hours | Pl. Ex. 112, JKCC-2158 | 5.33 hours | Pl. Ex. 11, JKCC-2092 |
| 6 | 10/16/17-10/29/17 | 17.33 hours | Pl. Ex. 112, JKCC-2158 | 8.42 hours | Pl. Ex. 11, JKCC-2092 |
| 7 | 10/30/17-11/12/17 | 12.42 hours | Pl. Ex. 112, JKCC-2158, JKCC-2159 | 6.08 hours | Pl. Ex. 11, JKCC-2092 |
| 8 | 11/13/17-11/26/17 | 6.42 hours | Pl. Ex. 112, JKCC-2159 | 2.83 hours | Pl. Ex. 11, JKCC-2092 |
| 9 | 11/27/17-12/10/17 | 2.67 hours | Pl. Ex. 112, JKCC-2159 | .17 hours | Pl. Ex. 11, JKCC-2092 |
| 10 | 12/11/17-12/24/17 | 12.58 hours | Pl. Ex. 112, JKCC-2159 | 6.25 hours | Pl. Ex. 11, JKCC-2092 |
| 11 | 12/25/17-1/7/18 | 5.16 hours | Pl. Ex. 112, JKCC-2159 | 1.42 hours | Pl. Ex. 11, JKCC-2092 |

| 12 | 1/8/18-1/21/18 | 3.92 hours | Pl. Ex. 112, JKCC-2159 | 1.67 hours | Pl. Ex. 11, JKCC-2092 |
|---|---|---|---|---|---|
| 13 | 1/22/18-2/4/18 | 7.84 hours | Pl. Ex. 112, JKCC-2159 | 3.25 hours | Pl. Ex. 11, JKCC-2092 |
| 14 | 2/5/18-2/18/18 | 5.17 hours | Pl. Ex. 112, JKCC-2159, JKCC-2160 | 1 hour | Pl. Ex. 11, JKCC-2092 |
| 15 | 2/19/18-3/4/18 | 8 hours | Pl. Ex. 112, JKCC-2160 | 3.5 hours | Pl. Ex. 11, JKCC-2092 |
| 16 | 3/5/18-3/18/18 | 10.76 hours | Pl. Ex. 112, JKCC-2160 | 4.08 hours | Pl. Ex. 11, JKCC-2092 |
| 17 | 3/19/18-4/1/18 | 10.24 hours | Pl. Ex. 112, JKCC-2160 | 5.84 hours | Pl. Ex. 11, JKCC-2092 |
| 18 | 4/2/18-4/15/18 | 13.01 hours | Pl. Ex. 112, JKCC-2160 | 6 hours | Pl. Ex. 11, JKCC-2092 |
| 19 | 4/16/18-4/29/18 | 16.34 hours | Pl. Ex. 112, JKCC-2160, JKCC-2161 | 8.33 hours | Pl. Ex. 11, JKCC-2092 |
| 20 | 4/30/18-5/13/18 | 15.25 hours | Pl. Ex. 112, JKCC-2161 | 7.42 hours | Pl. Ex. 11, JKCC-2092 |
| 21 | 5/14/18-5/27/18 | 7.92 hours | Pl. Ex. 112, JKCC-2161 | 3.08 hours | Pl. Ex. 11, JKCC-2092 |
| 22 | 5/28/18-6/10/18 | 11.83 hours | Pl. Ex. 112, JKCC-2161 | 5.92 hours | Pl. Ex. 11, JKCC-2092 |
| 23 | 6/11/18-6/24/18 | 12.83 hours | Pl. Ex. 112, JKCC-2161 | 4.83 hours | Pl. Ex. 11, JKCC-2092 |
| 24 | 6/25/18-7/8/18 | 8.92 hours | Pl. Ex. 112, JKCC-2161 | 3.92 hours | Pl. Ex. 11, JKCC-2092 |
| 25 | 7/9/18-7/22/18 | 9.99 hours | Pl. Ex. 112, JKCC-2161, JKCC-2162 | 3.08 hours | Pl. Ex. 11, JKCC-2092 |
| 26 | 7/23/18-8/5/18 | 19.5 hours | Pl. Ex. 112, JKCC-2162 | 11.58 hours | Pl. Ex. 11, JKCC-2092 |
| 27 | 8/6/18-8/19/18 | 10.25 hours | Pl. Ex. 112, JKCC-2162 | 4.42 hours | Pl. Ex. 11, JKCC-2092 |
| 28 | 8/20/18-9/2/18 | 12.75 hours | Pl. Ex. 112, JKCC-2162 | 6.75 hours | Pl. Ex. 11, JKCC-2093 |
| 29 | 9/3/18-9/15/18 | 16.59 hours | Pl. Ex. 112, JKCC-2162 | 8.35 hours | Pl. Ex. 11, JKCC-2093 |
| 30 | 9/16/18-9/29/18 | 2.25 hours | Pl. Ex. 112, JKCC-2162 | .2 hours | Pl. Ex. 11, JKCC-2093 |
| 31 | 9/30/18-10/13/18 | 15.17 hours | Pl. Ex. 112, JKCC-2162 | 9.17 hours | Pl. Ex. 11, JKCC-2093 |
| 32 | 10/14/18-10/27/18 | 13.92 hours | Pl. Ex. 112, JKCC-2162, JKCC-2163 | 8.25 hours | Pl. Ex. 11, JKCC-2093 |
| 33 | 10/28/18-11/10/18 | 20.07 hours | Pl. Ex. 112, JKCC-2163 | 11.67 hours | Pl. Ex. 11, JKCC-2093 |
| 34 | 11/11/18-11/24/18 | 11.75 hours | Pl. Ex. 112, JKCC-2163 | 4.58 hours | Pl. Ex. 11, JKCC-2093 |
| 35 | 11/25/18-12/8/18 | 12.26 hours | Pl. Ex. 112, JKCC-2163 | 6.25 hours | Pl. Ex. 11, JKCC-2093 |
| 36 | 12/9/18-12/22/18 | 10.08 hours | Pl. Ex. 112, JKCC-2163 | 3.33 hours | Pl. Ex. 11, JKCC-2093 |
| 37 | 12/23/18-1/5/19 | 10.17 hours | Pl. Ex. 112, | 4 hours | Pl. Ex. 11, |

United States District Court
Northern District of California

| | | | JKCC-2163 | | JKCC-2093 |
|---|---|---|---|---|---|
| 38 | 1/6/19-1/19/19 | 4.75 hours | Pl. Ex. 112, JKCC-2163, JKCC-2164 | 1.75 hours | Pl. Ex. 11, JKCC-2093 |
| 39 | 1/20/19-2/2/19 | 14.09 hours | Pl. Ex. 112, JKCC-2164 | 9.25 hours | Pl. Ex. 11, JKCC-2093 |
| 40 | 2/3/19-2/16/19 | 1.17 hours | Pl. Ex. 112, JKCC-2164 | 0 hours | Pl. Ex. 11, JKCC-2093 |
| 41 | 2/17/19-3/2/19 | 4.67 hours | Pl. Ex. 112, JKCC-2164 | 1.33 hours | Pl. Ex. 11, JKCC-2093 |
| 42 | 3/31/19-4/13/19 | 14.17 hours | Pl. Ex. 112, JKCC-2165 | 9.67 hours | Pl. Ex. 11, JKCC-2093 |

26) Jared Moorehead, 2 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 2/3/19-2/16/19 | 0.5 hours | Pl. Ex. 114, JKCC-2236 | 0 hours | Pl. Ex. 11, JKCC-2093 |
| 2 | 2/17/19-3/2/19 | 11.92 hours | Pl. Ex. 114, JKCC-2236 | 7.67 hours | Pl. Ex. 11, JKCC-2093 |

27) Ivanne Mora, 1 pay period:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 6/25/18-7/8/18 | 6.17 hours | Pl. Ex. 118, JKCC-2170 | 2.75 hours | Pl. Ex. 11, JKCC-2094 |

28) Nemia Qoro, 4 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 12.68 hours | Pl. Ex. 141, JKCC-2176 | 5.58 hours | Pl. Ex. 11, JKCC-2095 |
| 2 | 10/2/17-10/15/17 | 7.08 hours | Pl. Ex. 141, JKCC-2177 | 3.08 hours | Pl. Ex. 11, JKCC-2095 |
| 3 | 10/16/17-10/29/17 | 7.34 hours | Pl. Ex. 141, JKCC-2177 | 2.67 hours | Pl. Ex. 11, JKCC-2095 |
| 4 | 10/30/17-11/12/17 | 5.84 hours | Pl. Ex. 141, JKCC-2177 | 1.42 hours | Pl. Ex. 11, JKCC-2095 |

29) Willie Ray, 17 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 11.01 hours | Pl. Ex. 146, JKCC-2245 | 9.67 hours | Pl. Ex. 11, JKCC-2096 |
| 2 | 8/21/17-9/3/17 | 16 hours | Pl. Ex. 146, JKCC-2245, JKCC-2246 | 8.58 hours | Pl. Ex. 11, JKCC-2096 |
| 3 | 9/4/17-9/17/17 | 8.75 hours | Pl. Ex. 146, JKCC-2246 | 2.75 hours | Pl. Ex. 11, JKCC-2096 |
| 4 | 9/18/17-10/1/17 | 5.67 hours | Pl. Ex. 146, JKCC-2246 | 1.67 hours | Pl. Ex. 11, JKCC-2096 |
| 5 | 10/2/17-10/15/17 | 7.83 hours | Pl. Ex. 146, JKCC-2246 | 2.42 hours | Pl. Ex. 11, JKCC-2096 |
| 6 | 10/16/17-10/29/17 | 15.49 hours | Pl. Ex. 146, JKCC-2246 | 14.42 hours | Pl. Ex. 11, JKCC-2096 |

United States District Court
Northern District of California

| 7 | 10/30/17-11/12/17 | 12.84 hours | Pl. Ex. 146, JKCC-2246, JKCC-2247 | 5.83 hours | Pl. Ex. 11, JKCC-2096 |
|---|---|---|---|---|---|
| 8 | 11/13/17-11/26/17 | 16.33 hours | Pl. Ex. 146, JKCC-2247 | 8.83 hours | Pl. Ex. 11, JKCC-2096 |
| 9 | 11/27/17-12/10/17 | 12.91 hours | Pl. Ex. 146, JKCC-2247 | 11.41 hours | Pl. Ex. 11, JKCC-2096 |
| 10 | 12/11/17-12/24/17 | 5.42 hours | Pl. Ex. 146, JKCC-2247 | 1.5 hours | Pl. Ex. 11, JKCC-2096 |
| 11 | 12/25/17-1/7/18 | 4.42 hours | Pl. Ex. 146, JKCC-2247 | 1 hour | Pl. Ex. 11, JKCC-2096 |
| 12 | 1/8/18-1/21/18 | 6.67 hours | Pl. Ex. 146, JKCC-2247 | 2.67 hours | Pl. Ex. 11, JKCC-2096 |
| 13 | 1/22/18-2/4/18 | 7.5 hours | Pl. Ex. 146, JKCC-2247, JKCC-2248 | 2.42 hours | Pl. Ex. 11, JKCC-2096 |
| 14 | 2/5/18-2/18/18 | 8.74 hours | Pl. Ex. 146, JKCC-2248 | 2.75 hours | Pl. Ex. 11, JKCC-2096 |
| 15 | 2/19/18-3/4/18 | 9.91 hours | Pl. Ex. 146, JKCC-2248 | 5.42 hours | Pl. Ex. 11, JKCC-2096 |
| 16 | 3/5/18-3/18/18 | 8.17 hours | Pl. Ex. 146, JKCC-2248 | 3 hours | Pl. Ex. 11, JKCC-2096 |
| 17 | 3/19/18-4/1/18 | 4.45 hours | Pl. Ex. 146, JKCC-2248 | 1.87 hours | Pl. Ex. 11, JKCC-2096 |

30) Christopher Rosado, 6 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 6.16 hours | Pl. Ex. 150, JKCC-2249 | 3.42 hours | Pl. Ex. 11, JKCC-2096 |
| 2 | 8/21/17-9/3/17 | 5.08 hours | Pl. Ex. 150, JKCC-2249 | 1.67 hours | Pl. Ex. 11, JKCC-2096 |
| 3 | 9/4/17-9/17/17 | 3.66 hours | Pl. Ex. 150, JKCC-2249 | .83 hours | Pl. Ex. 11, JKCC-2096 |
| 4 | 9/18/17-10/1/17 | 5 hours | Pl. Ex. 150, JKCC-2249 | 1.33 hours | Pl. Ex. 11, JKCC-2096 |
| 5 | 10/2/17-10/15/17 | 6.75 hours | Pl. Ex. 150, JKCC-2249 | 3.75 hours | Pl. Ex. 11, JKCC-2097 |
| 6 | 10/16/17-10/29/17 | 10 hours | Pl. Ex. 150, JKCC-2249, JKCC-2250 | 5.75 hours | Pl. Ex. 11, JKCC-2097 |

31) Joshua Sanchez, 4 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|---|---|---|---|---|---|
| 1 | 8/7/17-8/20/17 | 7.92 hours | Pl. Ex. 154, JKCC-2179 | 4.42 hours | Pl. Ex. 11, JKCC-2097 |
| 2 | 8/21/17-9/3/17 | 5.99 hours | Pl. Ex. 154, JKCC-2179 | 3.42 hours | Pl. Ex. 11, JKCC-2097 |
| 3 | 9/4/17-9/17/17 | 3.74 hours | Pl. Ex. 154, JKCC-2179 | .67 hours | Pl. Ex. 11, JKCC-2097 |
| 4 | 9/18/17-10/1/17 | 12.17 hours | Pl. Ex. 154, JKCC-2179 | 4.08 hours | Pl. Ex. 11, JKCC-2097 |

32) Todd Turnipseed, 10 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 3/19/18-4/1/18 | 8.66 hours | Pl. Ex. 158, JKCC-2251 | 1.2 hours | Pl. Ex. 11, JKCC-2097 |
| 2 | 4/2/18-4/15/18 | 12.58 hours | Pl. Ex. 158, JKCC-2251 | 9.42 hours | Pl. Ex. 11, JKCC-2097 |
| 3 | 4/16/18-4/29/18 | 24.09 hours | Pl. Ex. 158, JKCC-2251 | 23 hours | Pl. Ex. 11, JKCC-2097 |
| 4 | 4/30/18-5/13/18 | 15.41 hours | Pl. Ex. 158, JKCC-2251 | 9.08 hours | Pl. Ex. 11, JKCC-2097 |
| 5 | 5/14/18-5/27/18 | 6.34 hours | Pl. Ex. 158, JKCC-2251 | 1.5 hours | Pl. Ex. 11, JKCC-2097 |
| 6 | 5/28/18-6/10/18 | 5.58 hours | Pl. Ex. 158, JKCC-2251, JKCC-2252 | 2.58 hours | Pl. Ex. 11, JKCC-2097 |
| 7 | 6/11/18-6/24/18 | 9.41 hours | Pl. Ex. 158, JKCC-2252 | 5 hours | Pl. Ex. 11, JKCC-2097 |
| 8 | 6/25/18-7/8/18 | 13.09 hours | Pl. Ex. 158, JKCC-2252 | 5.17 hours | Pl. Ex. 11, JKCC-2097 |
| 9 | 7/9/18-7/22/18 | 9.5 hours | Pl. Ex. 158, JKCC-2252 | 4.58 hours | Pl. Ex. 11, JKCC-2097 |
| 10 | 7/23/18-8/5/18 | 3.5 hours | Pl. Ex. 158, JKCC-2252 | 1.5 hours | Pl. Ex. 11, JKCC-2097 |

33) Ronald Vigil, 10 pay periods:

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 9/30/18-10/13/18 | 6.67 hours | Pl. Ex. 163, JKCC-2253 | 2.67 hours | Pl. Ex. 11, JKCC-2098 |
| 2 | 10/14/18-10/27/18 | 10.09 hours | Pl. Ex. 163, JKCC-2253 | 6.75 hours | Pl. Ex. 11, JKCC-2098 |
| 3 | 10/28/18-11/10/18 | 19.08 hours | Pl. Ex. 163, JKCC-2253 | 10.83 hours | Pl. Ex. 11, JKCC-2098 |
| 4 | 11/11/18-11/24/18 | 9.16 hours | Pl. Ex. 163, JKCC-2253 | 3.83 hours | Pl. Ex. 11, JKCC-2098 |
| 5 | 11/25/18-12/8/18 | 7.25 hours | Pl. Ex. 163, JKCC-2253 | 2.25 hours | Pl. Ex. 11, JKCC-2098 |
| 6 | 12/9/18-12/22/18 | 8.91 hours | Pl. Ex. 163, JKCC-2253, JKCC-2254 | 2.75 hours | Pl. Ex. 11, JKCC-2098 |
| 7 | 12/23/18-1/5/19 | 8.91 hours | Pl. Ex. 163, JKCC-2254 | 2 hours | Pl. Ex. 11, JKCC-2098 |
| 8 | 1/6/19-1/19/19 | 3.25 hours | Pl. Ex. 163, JKCC-2254 | .67 hours | Pl. Ex. 11, JKCC-2098 |
| 9 | 1/20/19-2/2/19 | 8.99 hours | Pl. Ex. 163, JKCC-2254 | 4.5 hours | Pl. Ex. 11, JKCC-2098 |
| 10 | 7/7/19-7/20/19 | 4.83 hours | Pl. Ex. 163, JKCC-2258 | 0 hours | Pl. Ex. 11, JKCC-2098 |

34) Eric Williams Jr., 15 pay periods

| No. | Pay Period | OT Worked | Cite | OT Paid | Cite |
|-----|-----------|-----------|------|---------|------|
| 1 | 8/7/17-8/20/17 | 7.92 hours | Pl. Ex. 170, JKCC-2260 | 4.42 hours | Pl. Ex. 11, JKCC-2099 |

| 2 | 8/21/17-9/3/17 | 6.42 hours | Pl. Ex. 170, JKCC-2260 | 1.42 hours | Pl. Ex. 11, JKCC-2099 |
|---|---|---|---|---|---|
| 3 | 9/4/17-9/17/17 | 6.42 hours | Pl. Ex. 170, JKCC-2260 | 2.08 hours | Pl. Ex. 11, JKCC-2099 |
| 4 | 9/18/17-10/1/17 | 4.67 hours | Pl. Ex. 170, JKCC-2260 | .83 hours | Pl. Ex. 11, JKCC-2099 |
| 5 | 10/2/17-10/15/17 | 3.34 hours | Pl. Ex. 170, JKCC-2260 | .17 hours | Pl. Ex. 11, JKCC-2099 |
| 6 | 10/16/17-10/29/17 | 5.91 hours | Pl. Ex. 170, JKCC-2260 | 1.75 hours | Pl. Ex. 11, JKCC-2099 |
| 7 | 10/30/17-11/12/17 | 9.75 hours | Pl. Ex. 170, JKCC-2260, JKCC-2261 | 3.25 hours | Pl. Ex. 11, JKCC-2099 |
| 8 | 11/13/17-11/26/17 | 9.91 hours | Pl. Ex. 170, JKCC-2261 | 4.5 hours | Pl. Ex. 11, JKCC-2099 |
| 9 | 11/27/17-12/10/17 | 7.5 hours | Pl. Ex. 170, JKCC-2261 | 2.33 hours | Pl. Ex. 11, JKCC-2099 |
| 10 | 12/11/17-12/24/17 | 8 hours | Pl. Ex. 170, JKCC-2261 | 3.25 hours | Pl. Ex. 11, JKCC-2099 |
| 11 | 12/25/17-1/7/18 | 6 hours | Pl. Ex. 170, JKCC-2261 | 5.08 hours | Pl. Ex. 11, JKCC-2099 |
| 12 | 1/8/18-1/21/18 | 6.67 hours | Pl. Ex. 170, JKCC-2261 | 2.5 hours | Pl. Ex. 11, JKCC-2099 |
| 13 | 1/22/18-2/4/18 | 5.67 hours | Pl. Ex. 170, JKCC-2261, JKCC-2262 | 2.35 hours | Pl. Ex. 11, JKCC-2099 |
| 14 | 2/5/18-2/18/18 | 8.84 hours | Pl. Ex. 170, JKCC-2262 | 4.5 hours | Pl. Ex. 11, JKCC-2099 |
| 15 | 2/19/18-3/4/18 | 1.17 hours | Pl. Ex. 170, JKCC-2262 | .2 hours | Pl. Ex. 11, JKCC-2099 |

By adding up the pay periods listed above, the court finds that the 34 aggrieved employees did not receive overtime wages for a total of **392 pay periods** throughout the PAGA penalty period.

### 2.  Meal Periods (Labor Code § 512) for Aggrieved Employees

As explained above, in ruling on Defendants' motion in limine No. 1, the court held that Carter could seek PAGA penalties for missed meal breaks only to the extent that he could establish violations based solely on employees having signed unlawful on-duty meal period agreements because that evidence was in Defendants' possession.  Carter's meal break theory could not rely on other evidence that Defendants could have marshaled if they were given proper notice of the nature and value of Carter's PAGA claim.   As discussed below in the conclusions of law, the court finds that Defendants have not met their burden to justify on-duty meal periods. However, the mere existence of invalid on-duty meal period agreements does not alone establish

meal period violations.  Carter also must prove that Defendants did not provide compliant duty-free meal periods.  The court precluded Carter from pursuing this PAGA theory because Carter's delays in discovery disclosures prejudiced Defendants' ability to mount a defense against that theory.  As a result, the court does not make factual findings for aggrieved employees regarding meal period violations.

### 3.  Wage Statements (Labor Code § 226) for Aggrieved Employees

Carter's counsel confirmed that the wage statement claim is derivative of the overtime claim.  Tr. Vol. 1 at 15-16.  Therefore, the pay periods in which Defendants issued incorrect pay stubs corresponds to the pay periods for which Defendants failed to pay the total amount of overtime due, as set forth above.  The total number of pay periods for which Defendants issued incorrect pay stubs is the same number of pay periods for which Defendants failed to pay the total amount of overtime due – namely, **392 pay periods**.

### 4.  Final Wages (Labor Code §§ 201, 202) for Aggrieved Employees

The following 24 aggrieved employees (1) worked for Defendants during at least one pay period between the PAGA penalty period; (2) quit or were terminated from their employment; and (3) on at least one occasion worked in excess of 8 hours without receiving overtime pay, which means that they were owed wages at the time of their separation:

1.  Decatuer Carter
2.  Marshal Agharanya Jr.
3.  Alan Alfaro
4.  Gebrielle Amare
5.  Dijon Benefield
6.  Kamani Campbell
7.  Serverino Cortez
8.  Andrew Crowder
9.  Luis Dominguez
10. Michael Embaye
11. Tominiko Fonohema

12.     David Hughes

13.     Sione Maile

14.     Keith Mayfield

15.     Henry McKinley

16.     Mitchell Moore

17.     Jared Moorehead

18.     Ivanne Mora

19.     Nemia Qoro

20.     Willie Ray

21.     Christopher Rosado

22.     Joshua Sanchez

23.     Todd Turnipseed

24.     Eric Williams Jr.

Carter's submission also lists Ismael Viera and Joshua Parshey as former employees who are owed final wages. The court finds no evidence that either employee worked more than 8 hours in a day between August 11, 2017 and February 1, 2019 and did not receive appropriate overtime pay.

**5.  Wage Deductions (Labor Code § 221) for Aggrieved Employees**

Carter testified, and his payroll records corroborate, that Defendants deducted $17.12 from his paycheck for five pay periods in accordance with the telephone purchase plan. One of these deductions occurred within the PAGA penalty period. Pl. Exs. 4-5. Personnel and payroll records establish that four other employees signed the telephone purchase plan agreement and had deductions of $17.12 from their paychecks for the following number of pay periods during the PAGA penalty period:

Parshey: 13 pay periods. Pl. Exs. 127, 128.

Crowder: 7 pay periods. Pl. Exs. 57, 11 at JKCC-2082.

Moore: 19 pay periods. Pl. Exs. 110, 11 at JKCC-2092.

Qoro: 6 pay periods. Pl. Exs. 139, 11 at JKCC-2095.

The court finds that Defendants made 5 unlawful deductions of $17.12 each from Carter's pay for a total of **$85.60**. With respect to aggrieved employees, Defendants made unlawful deductions under the telephone purchase plan in **46** pay periods.

## II.    CONCLUSIONS OF LAW

Carter originally brought claims for (1) failure to provide meal and rest breaks as required by Labor Code sections 226.7, 512; (2) failure to pay overtime in violation of the FLSA; (3) failure to pay overtime as required by Labor Code section 510; (4) failure to timely pay wages in violation of Labor Code section 204; (5) failure to furnish complete and accurate itemized wage statements as required by Labor Code section 226(a); (6) violations of Labor Code sections 201 and 202 for failing to timely pay wages upon termination; (7) unlawful deductions from his wages in violation of Labor Code § 221; (8) failure to reimburse for business expenses as required by Labor Code section 2802; (9) retaliation in violation of Labor Code section 98.6; (10) retaliation in violation of Labor Code section 6310; (11) wrongful discharge in violation of public policy; and (12) violations of the UCL.  *See* Compl. ¶¶ 28-98.  For claims 1, 3, 4, 5, 6, 7, and 8 he sought relief on behalf of himself and other aggrieved employees under PAGA.[12]

The court granted summary judgment to Carter on his Labor Code overtime claim. [Docket No. 56 ("MSJ Order") at 15.]  The court also granted summary judgment to Carter on his derivative section 201 and 226(a) claims to the extent that those claims are premised on his Labor Code overtime claim.  *Id.* at 16, 17-18.  However, the issue of damages on those claims proceeded to trial and is addressed below.  At the pre-trial conference, Carter confirmed that his claim under Labor Code section 204 (and therefore the corresponding PAGA claim) are no longer at issue.

As set forth above, the court precluded Carter from seeking PAGA penalties for meal period violations and for failure to reimburse business expenses.  Carter withdrew his PAGA claim for rest break violations.

The court now turns to its conclusions of law for each remaining claim.

---

[12] Carter's complaint also seeks PAGA relief for his retaliation claim, but he never explained what that is, nor did he pursue it.

United States District Court
Northern District of California

**A. Meal Breaks**

In general, California law requires employers to provide non-exempt employees with a 30-minute meal break after no more than five hours of work, and a second meal break after no more than ten hours of work.  Cal. Lab. Code § 512; IWC Wage Order No. 9-2001, § 11(A).  An employer satisfies this requirement "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1040 (2012).  However, meal periods where the employee remains "on duty" are permitted where (1) the "nature of the work prevents an employee from being relieved of all duty"; (2) the parties agree in writing to have on-duty, paid meal periods; and (3) the agreement states that the employee may, in writing, revoke the agreement at any time.  Cal. Code Regs. tit. 8, § 11040(11)(A); IWC Wage Order. No 9-2001, § 11(C).

It is the employer's burden to "establish[] the facts that would justify an on-duty meal period." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 959 (9th Cir. 2013) (citation omitted).  The Department of Labor Standards Enforcement ("DLSE") laid out five non-exhaustive factors to consider when deciding whether the "nature of the work" exception applies to a particular job:

> (1) [T]he type of work, (2) the availability of other employees to provide relief to an employee during a meal period, (3) the potential consequences to the employer if the employee is relieved of all duty, (4) the ability of the employer to anticipate and mitigate these consequences such as by scheduling the work in a manner that would allow the employee to take an off-duty meal period, and (5) whether the work product or process will be destroyed or damaged by relieving the employee of all duty. DLSE Opinion Letter 2009.06.09 at 7.

*Id.* at 959 n.12 (citing DLSE Opinion Letter 2009.06.09 at 7).  "For example, in its most recent opinion letter, DLSE concluded that employees who transport hazardous materials, and are required by federal regulation to attend to their vehicles at all times, are covered by the 'nature of the work' exception." *Id.* at 959-60 (citing DLSE Opinion Letter 2009.06.09 at 8.)

The court concludes that Defendants did not meet their burden to establish that the nature of Junk King's work necessitates an on-duty meal period for its employees.  First, it is irrelevant that, as Vepa testified, it was impractical to require employees to drive all the way back from their

United States District Court
Northern District of California

worksites to the Livermore or San Leandro offices for an uninterrupted 30-minute lunch break. Defendants have not identified any authority that requires employers to provide an off-duty meal period that must occur at or near the home office. Next, Vepa testified that it is not possible for Junk King employees to take a lunch break at the same time every day. For example, he explained that an employee may be at the dump during the lunch hour and should not be forced to eat in the dump. Vepa also testified that the size and scope of jobs, travel time, and job scheduling is unpredictable. This testimony is off-point. Defendants did not identify any authority that a lunch period must be provided at the same time every day. Instead, the Labor Code and Wage Orders only require that a duty-free meal period be provided after no more than five hours of work. Cal. Lab. Code § 512; IWC Wage Order No. 9-2001, § 11(A). Defendants did not explain why it would not be possible to provide a 30-minute meal period sometime within the first five hours of work, even if it was not at the same time or same place every day. Finally, Defendants' current meal period practices belie the need for an on-duty meal period. Vepa testified that he now requires his employees to clock in and clock out for a meal period sometime between 11 a.m. and 1 p.m. During the time they are clocked out, employees are not required to perform the physical aspects of their job, such as driving or lifting items. This testimony establishes that it is possible for employees to take a break somewhere near their route or job site, within the first 5 hours of the day, at a time when they are not stuck in traffic or at the dump. Thus, the reasons offered by Vepa to support the on-duty meal period are undermined by Junk King's current practices. The court finds that Defendants have not established a justification for on-duty meal periods and that therefore they were required to provide an off-duty meal period of at least 30 minutes during the first five hours of work.

As set forth above, in ruling on Defendants' motion in limine No. 1, the court precluded Carter from seeking PAGA penalties for meal period violations except to the extent that they could be established solely on the existence of invalid on-duty meal period agreements. Carter cannot do so. The court barred Carter from attempting to establish PAGA meal period violations on other grounds because Carter's failure to provide timely notice of those theories prevented Defendants from mounting a defense. Preparing a defense against Carter's individual meal period

United States District Court
Northern District of California

1    claim valued at less than $2,000 is far different from defending against a claim for $162,100 in

2    PAGA penalties for meal violations, the amount that Carter sprung on Defendants for the first

3    time on the brink of trial.  A reasonable defendant would likely invest far more time and resources

4    in defending against the latter, given the significantly higher stakes.  For these reasons, as a

5    litigation sanction, the court held in its ruling on Defendants' motion in limine No. 1 that Carter

6    cannot seek PAGA meal period violations for aggrieved employees on the theory that Vepa did

7    not allow employees to take lawful meal breaks.  Tr. Vol. 1 at 28:9-29:12.

8           However, the court allowed Carter to proceed with his individual claim for meal period

9    violations.  With respect to that claim, Carter has established that he was not able to take duty-free,

10   uninterrupted meal periods.  Vepa, Beltre, Gradford, and Helu all testified that Junk King

11   employees take meal breaks every day, sometime for longer than 30 minutes.  However, Vepa

12   testified that employees are expected to respond to phone calls and texts from Vepa or the call

13   center.  Gradford corroborates Vepa's explanation.  He testified that he sometimes receives or

14   makes work-related calls during his meal breaks.  A requirement that employees respond to texts

15   or calls during their lunch period does not satisfy an employer's obligation to "relieve[] its

16   employees of all duty, relinquish[] control over their activities and permit[] them a reasonable

17   opportunity to take an uninterrupted 30-minute break."  *Brinker*, 53 Cal. 4th at 1040.  "[O]ne

18   cannot square the practice of compelling employees to remain at the ready, tethered by time and

19   policy to particular locations or communications devices, with the requirement to relieve

20   employees of all work duties and employer control . . . ."  *Augustus v. ABM Sec. Servs., Inc.*, 2

21   Cal. 5th 257, 269 (2016).  The requirement that employees stay on call during their meal period

22   constitutes a meal break violation even for days in which they did not actually receive any calls or

23   texts.  *See United Steel v. Shell Oil Co.*, No. 8-cv-3693-RGK, 2010 WL 11508796, at *5 (C.D.

24   Cal. Aug. 27, 2010) ("The duties at issue in this case are not restricted to plaintiffs' actual

25   response to calls and alarms. The mere ongoing requirement to remain on the premises at ready to

26   respond to calls is a duty in and of itself sufficient to show that plaintiffs were not relieved of all

27   duty.").

28          Carter is entitled to meal period premiums amounting to **$1,679.75** in accordance with the

1   calculations set forth above in the findings of fact.  *See* Pl. Ex. 3 (JKCC-001809 to -10).

2       **B. Rest Breaks**

3       California law requires that employers permit all employees to take a rest period of ten

4   minutes for each four hours of work.  IWC Wage Order 9-2001, § 12(A).  Employers must

5   "authorize and permit all employees to take rest breaks, which insofar as practicable shall be in the

6   middle of each work period."  Cal. Code Regs., tit. 8, § 11090.  While employers are required to

7   make meal and rest breaks available, they do not have to ensure that employees actually take

8   breaks.  *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 953 (N.D. Cal. 2016).  To

9   survive summary judgment on a meal or rest break claim, "[a]n employee must show that the

10  employer actually prevented the employee from taking breaks; mere proof of knowledge that the

11  employee was forgoing breaks is insufficient."  *Reece v. Unitrin Auto & Home Ins. Co.*, No. 11-

12  cv-03960-EJD, 2013 WL 245452, at *5 (N.D. Cal. Jan. 22, 2013) (citing *Brinker*, 53 Cal. 4th at

13  1040).

14      Carter testified that he never once took a rest break while he was employed by Defendants

15  except when customers asked him to take a break.  He stated that Vepa wanted employees to

16  "work as fast as possible" and made sure they were "always constantly working so there's no

17  down time."  Tr. Vol. 3 at 417:1-5.  He also received numerous text messages from Vepa while he

18  was working.  By contrast, Vepa testified that he encourages his employees to take rest breaks as

19  needed.  Beltre also testified that Vepa encourages employees to take breaks and that he and other

20  employees frequently take multiple breaks per day.  Beltre recalled taking rest breaks with Carter

21  on the days they worked together.  Beltre stated that employees do not work the whole day

22  without stopping and that he never saw Carter work a whole day without a rest break.  Beltre also

23  testified that he has never heard from any other employee that they were unable to take a meal or

24  rest break during the day.  Gradford stated that in the five years he worked for Defendants, there

25  has never been a day where he missed a rest break.  Helu also testified that he takes breaks during

26  the day.  Above, the court found that Beltre's, Gradford's, and Helu's testimony on the issue of

27  rest breaks is more credible than Carter's testimony that he was never able to take a single rest

28  break during the entire nine months he worked for Defendants.

United States District Court
Northern District of California

1    Accordingly, the court grants judgment for Defendants on Carter's rest break claim.

2    **C.  Overtime**

3        **1.  FLSA Overtime**

4        Under the FLSA, an employer must pay overtime to "any of his employees who in any

5    workweek is engaged in commerce or in the production of goods for commerce, or is employed in

6    an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. §

7    207(a)(1).  Overtime begins accruing once an employee works more than forty hours per week.  29

8    U.S.C. § 207(a)(2).  The FLSA defines "commerce" as "trade, commerce, transportation,

9    transmission, or communication among the several States or between any State and any place

10   outside thereof."  29 U.S.C. § 203(b).

11       Defendants moved for summary judgment on Carter's FLSA claim, arguing that Carter

12   was not "engaged in commerce" within the meaning of FLSA, nor is Junk King an enterprise that

13   is engaged in commerce.  The court denied the motion on the basis that neither party presented

14   relevant authority on enterprise coverage under the FLSA.  MSJ Order at 21-22.

15       Carter's post-trial submissions make clear that he is only claiming unpaid overtime for

16   himself for the pay period from August 7, 2017 through August 20, 2017.  *See* Pl. FF/CL at 25-26.

17   During that pay period, Carter worked only one day.  *See* Pl. Ex. 3, JKCC-1801.  There is no

18   evidence that Carter worked more than 40 hours in a week, which would be required to establish

19   liability under the FLSA.

20       The court need not decide whether Junk King was an enterprise engaged in commerce as

21   defined in FLSA because Carter has not shown that he worked more than 40 hours in any week.

22   Accordingly, the court finds that Carter has not met his burden to establish a FLSA violation and

23   grants judgment for Defendants on this claim.

24       **2.  Labor Code Overtime**

25       "Any work in excess of eight hours in one workday and any work in excess of 40 hours in

26   any one workweek and the first eight hours worked on the seventh day of work in any one

27   workweek shall be compensated at the rate of no less than one and one-half times the regular rate

28   of pay for an employee."  Cal. Lab. Code § 510; *see also* IWC Wage Order 9-2001, § 3(A).

United States District Court
Northern District of California

Carter's overtime claim raises two separate issues: (1) whether Defendants improperly paid Carter his regular hourly rate for all nine hours in his workday that included an on-duty meal break, rather than paying overtime for the ninth hour of work (i.e. "9th hour overtime"), and (2) whether Defendants failed to pay Carter for the time he allegedly worked after he clocked out for the evening (i.e. "off-the-clock overtime"). The court evaluates Carter's claim under both theories.

### a.    "9th Hour" Overtime
#### 1)  Liability

It is undisputed that, prior to February 1, 2019, Defendants paid employees their standard hourly rates for their first nine hours of work. At summary judgment, the court rejected Defendants' argument that the employees' on-duty meal periods did not count toward "hours worked" for the purposes of overtime. MSJ Order at 13-14. The court held that even if Defendants' on-duty meal period policy were valid, which it is not, Defendants would still be required pay employees an overtime rate to any employee who works more than eight hours in a day, counting the on-duty meal period. *Id.* Therefore, the court already found that Defendants were liable on the Labor Code overtime claim for work performed prior to February 1, 2019.

Defendants argue that there is no evidence of overtime violations after February 1, 2019. Def. FF/CL at 13. Specifically, they assert that they changed their policy on that date and have since paid their employees overtime any for each hour they work in excess of 8 hours in a day. *Id.* Defendants contend that therefore, "Plaintiff did not reliably establish that any employees failed to receive all earned overtime after February 1, 2019." Def. FF/CL at 14. To the contrary, as set forth above in the findings of fact, the payroll records demonstrate that a small number of overtime violations did occur after February 1, 2019.

The court grants judgment to Carter on his overtime claim under the Labor Code.

#### 2)  Damages

With respect to Carter's individual case, the evidence establishes that Carter is owed one hour in unpaid overtime wages. *See* section I.G.1 at 1) above; *see also* Pl. Ex. 3 (JKCC-001810), Ex. 4 (JKCC-001761). His evidence shows that he worked 1.83 hours of overtime and was only

1    paid overtime for .83 hours.  Therefore, he is owed **$21.75**, based on "time-and-a-half" of his

2    regular rate of pay of $14.50.

3                                    **3)  Civil Penalties**

4          Carter also seeks civil penalties under PAGA on behalf of himself and other aggrieved

5    employees for Defendant's "9th Hour Violations."  *See* Pl. FF/CL at 433-34.

6          PAGA establishes civil penalties for violations of Labor Code provisions "except those for

7    which a civil penalty is specifically provided."  Cal. Lab. Code § 2699(f); *Iskanian v. CLS Transp.*

8    *Los Angeles, LLC*, 59 Cal. 4th 348, 379 (2014) ("For Labor Code violations for which no penalty

9    is provided . . . .").  In other words, "the PAGA also distinguishes between a provision of the

10   Labor Code that provides its own civil penalty and a provision with no specified penalty."

11   *Villacres v. ABM Indus. Inc.*, 189 Cal. App. 4th 562, 580 (2010).  "The PAGA provides the

12   applicable civil penalty if a particular Labor Code provision does not specify one."  *Id.*  The

13   default PAGA penalty is "one hundred dollars ($100) for each aggrieved employee per pay period

14   for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay

15   period for each subsequent violation."  Cal. Lab. Code § 2699(f)(2).  Civil penalties are distributed

16   as follows: "75 percent to the Labor and Workforce Development Agency for enforcement of

17   labor laws . . . and for education of employers and employees about their rights and

18   responsibilities under [the Labor Code] . . . ; and 25 percent to the aggrieved employees."  *Id.*

19   § 2699(i).

20         Carter fails to state how he calculates civil penalties for his PAGA overtime claim.

21   However, the law is clear that "failure to pay overtime compensation (§ 510) is subject to the civil

22   penalty provided in section 558," and so the default PAGA penalty under section 2699(f) does not

23   apply.  *Villacres*, 189 Cal. App. 4th at 580.  Section 558 awards a civil penalty of $50 per

24   employee per pay period as civil penalties for initial violations and $100 per employee per pay

25   period for subsequent violations.  Cal. Lab. Code § 558(a)(1)-(2).  "California law is clear that a

26   'subsequent violation' level applies only to violations after the employer is on notice that its

27   continued conduct is unlawful."  *Steenhuyse v. UBS Fin. Servs., Inc.*, 317 F. Supp. 3d 1062, 1067-

28   68 (N.D. Cal. 2018); *see Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1209 (2008)

United States District Court
Northern District of California

                                         43

1  ("Until the employer has been notified that it is violating a Labor Code provision . . . the employer

2  cannot be presumed to be aware that its continuing underpayment of employees is a 'violation'

3  subject to penalties.").  Carter never argued that Defendants had prior notice that their on-duty

4  meal break policy violated the Labor Code's provisions on overtime pay.  Therefore, the court

5  finds it appropriate to award the lower section 558 penalty for "initial violations" only and not for

6  "subsequent violations."  The court awards $50 for each underpaid employee for each pay period

7  in which they were denied overtime.

8  Above, the court calculated that 34 aggrieved employees were denied overtime in a total of

9  **392** pay periods.  The PAGA penalties for the overtime violation is 392 x $50, or **$19,600**.

10  **b.   Off-the-Clock Overtime**

11  As set forth above in the findings of fact, Carter did not specifically testify about instances

12  in which he started work before 7:00 a.m. but Vepa overrode his clock-in time to reflect a 7:00

13  a.m. start time.  Carter did not point to a single time record or discuss any particular time frame

14  from which the court could conclude that he worked off the clock such that he worked more than 8

15  hours on a specific day but was not paid overtime.  The court therefore finds that Carter has not

16  established an individual claim for overtime based on working off the clock

17  **D.  Wage Statements**

18  Labor Code section 226(a) requires employers to furnish accurate wage statements that

19  include, among other things, the gross and net wages earned and all applicable hourly rates in

20  effect during the pay period. Cal. Lab. Code § 226(a).  Carter argues that his wage statements and

21  the wage statements of other Junk King employees are inaccurate because they do not reflect the

22  overtime wages and rates the employees were entitled to receive for their on-duty meal periods.

23  Carter's counsel confirmed that the wage statement claim is solely derivative of these overtime

24  and meal break claims.  The court granted summary judgment for Carter on this claim to the extent

25  it is premised on Defendants' overtime violations; the court precluded Carter from seeking PAGA

26  penalties for meal break violations as a result of its ruling on Defendants' motion in limine No. 1.

27  Therefore, the court grants judgment to Carter and to aggrieved employees for the PAGA claim

28  for inaccurate wage statements to the extent it is derivative of the overtime violation claim.

Both statutory damages and civil penalties are available for wage statement violations under Labor Code section 226. *Raines v. Coastal Pac. Food Distributors, Inc.*, 23 Cal. App. 5th 667, 675 (2018).[13]  An employee seeking statutory damages must show that they "suffer[ed] injury as a result of a knowing and intentional" violation of section 226(a), while an employee seeking to recover civil penalties under PAGA must simply show a violation of that section.  Cal. Labor Code §§ 226(e)(1), 226.3; *see Raines*, 23 Cal. App. 5th at 679; *accord Culley v. Lincare Inc.*, 236 F. Supp. 3d 1184, 1194 (E.D. Cal. 2017) ("[A] PAGA plaintiff can collect civil penalties set out in § 226.3, and, if the wage statement violations create 'injury as a result of a knowing and intentional' violation, the statutory penalties set out in § 226(e)(1).").  Carter seeks statutory damages for his own wage statement violations in addition to civil penalties for aggrieved employees under PAGA.

**1.  Statutory Damages**

Section 226 provides:

> An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000).

Cal. Lab. Code § 226(e)(1).

In order to recover section 226(e)(1) penalties, a plaintiff must show "(1) a violation of the statutory provision setting forth criteria for wage statements, (2) that the violation was knowing and intentional, and (3) that the employee suffered an injury as a result of the violation." *Cleveland*, 200 F. Supp. 3d at 957.

With respect to the first element, the court has already held that Carter established violations of section 226(a) based on Defendants' failure to properly calculate and pay overtime wages.  As for the second element, courts are divided over the correct interpretation of section

---

[13] The statutory damages are also referred to as "statutory penalties."  The court uses the term "statutory damages" to minimize confusion.  *See Lopez v. Friant & Assocs., LLC*, 15 Cal. App. 5th 773, 781 n.3 (2017).

United States District Court
Northern District of California

226(e)(1)'s "knowing and intentional" requirement. *See Arroyo v. Int'l Paper Co.*, No. 17-cv-06211-BLF, 2020 WL 887771, at *11-12 (N.D. Cal. Feb. 24, 2020) (surveying the two lines of authority on the subject). Carter does not advance any argument as to how the court should interpret "knowing and intentional" or reasons why Defendants' conduct meets that standard in this case. Carter's entire section on this claim contains only legal standards, with no reference to the facts of this case. *See* Pl. FF/CL at 439-42. The court has no obligation to guess at what his argument might be.

For the final element, section 226(e)(2) lays out circumstances in which an injury is presumed for the purposes of awarding statutory penalties. "An employee is deemed to suffer injury for the purposes of this subdivision if the employer fails to provide a wage statement." Cal. Labor Code § 226(e)(2)(A).[14] Carter does not argue that he is entitled to a presumption of injury under any of the specific circumstances described in section 226(e)(2), nor do any of those provisions appear to apply in this case. To the extent his argument is that any failure to pay overtime entitles a plaintiff to statutory damages for inaccurate wage statements, he is incorrect. *See Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308, 1336-37 (2018) (rejecting the argument that "any failure to pay overtime at the appropriate rate also generates a wage statement injury justifying the imposition of wage statement penalties").

The court concludes that while Carter has established violations of section 226(a), he has not met his burden to prove that he is entitled to statutory damages for the violations.

### 2.  Civil Penalties

For violations of section 226(a), section 226.3 provides civil penalties in the amount of "two hundred fifty dollars ($250) per employee per violation in an initial citation and one thousand dollars ($1,000) per employee for each violation in a subsequent citation." Cal. Lab. Code § 226.3; *Heritage Residential Care, Inc. v. Div. of Lab. Standards Enf't*, 192 Cal. App. 4th 75, 80 (2011). The parties agree that the calculation for civil penalties under section 226.3 is the

---

[14] The other sub-section, referring to an employer's failure to provide "accurate and complete information" about specific items on the wage statement set forth in section 226(a) that the employee "cannot promptly and easily determine," is not relevant here. Cal. Lab. Code § 226(e)(2)(B).

number of pay periods in which each aggrieved employee received an inaccurate wage statement, multiplied by $250. They also agree that civil penalties in this case may only be recovered at the $250 initial violation amount.

Carter appears to seek penalties for 562 pay periods at issue. Pl. FF/CL at 442. Carter's number relies on his overtime calculations. As noted above, many of those calculations contained errors and so the number of pay periods claimed by Carter is not accurate.

Based on the court's calculations detailed above, there are **392** pay periods at issue. **392** x $250 = **$98,000** in PAGA penalties for wage statement violations.

**E. Final Wages**

Employees who are fired are entitled to receive their "wages earned and unpaid" immediately upon discharge. Cal. Lab. Code § 201(a). By contrast, employees who leave their jobs voluntarily must receive their wages within 72 hours after they end their employment, subject to exceptions that are irrelevant. *Id.* § 202(a). Unpaid overtime wages can serve as the basis for a violation of Labor Code sections 201 and 202. *See Frausto v. Bank of Am., Nat'l Ass'n*, No. 18-cv-01983-MEJ, 2018 WL 3659251, at *6 (N.D. Cal. Aug. 2, 2018).

If an employer "willfully fails to pay" final wages owed under sections 201 and 202, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced" not to exceed 30 days. Cal. Lab. Code § 203(a). "As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act which was required to be done." *Iljas v. Ripley Ent. Inc.*, 403 F. Supp. 3d 793, 803 (N.D. Cal. 2019) (quoting *Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1, 7 (1981)). "However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." Cal. Code Regs. tit. 8, § 13520. California regulations define a "good faith dispute" as follows:

> A "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of

a "good faith dispute."

Cal. Code Regs. tit. 8, § 13520(a).

Carter's final wages claim is premised on Defendants' failure to pay employees overtime wages at the time they quit or were terminated. The court granted summary judgment for Carter on that claim and so only the question of remedy remains.

### 1. Statutory Damages

Carter seeks waiting penalties for Defendants' failure to pay him final wages upon his discharge. Pl. FF/CL at 443.[15] He argues, albeit in a conclusory fashion, that Defendants' violations were willful. *Id.* Defendants do not address Carter's individual claim for waiting time penalties at all. *See* Def. FF/CL at 28.

The court ruled at summary judgment that Carter was not paid his final wages upon termination. Because Defendants have not argued the existence of a good faith dispute, the court finds that Carter is entitled to individual waiting time penalties for thirty days pursuant to section 203, calculated as **$3,480** ($14.50 per hour x 8 hours per day x 30 days).

### 2. Civil Penalties

Carter also seeks civil penalties under PAGA for failure to pay final wages under sections 201, 202, and 203. Pl. FF/CL at 443.

As a preliminary matter, the court addresses whether civil penalties are available for a section 203 violation. Section 203 waiting time penalties are a type of "statutory damages" that employees may collect in their individual capacity and do not constitute a civil penalty. *Esparza v. KS Indus., L.P.*, 13 Cal. App. 5th 1228, 1242 (2017) (interpreting *Iskanian*, 59 Cal. 4th at 381). Carter does not explain his conclusory assertion that PAGA penalties are available for failure to pay waiting time penalties, and the court could not locate any authority to support this proposition. Absent any argument from either party on this question, the court declines to guess at what those arguments might be and concludes that Carter failed to meet his burden to prove that he is entitled to seek PAGA penalties on behalf of aggrieved employees for failure to pay waiting time penalties

---

[15] Carter does not specify, but the court assumes his individual claim is under section 201 given that he was fired.

48

1    under section 203.

2        Turning to sections 201 and 202, the default PAGA penalty applies to violations of those

3    provisions. *See* Cal. Lab. Code § 2699(f). Carter seeks only the lower "initial violations" penalty.

4        Carter seeks penalties for an astounding 2,204 pay periods. He reaches this calculation by

5    assessing a penalty of $100 for each pay period where an employee quit or was fired, and then

6    adding a penalty of $100 for each following pay period up to September 18, 2021. For example,

7    Amare only worked for Defendants during two pay periods and was terminated on December 16,

8    2017. Pl. Exs. 21, 22. Using Carter's calculations of damages, Amare is entitled to $100 per pay

9    period from December 16, 2017 to September 18, 2021, resulting in an award of $9,900 solely for

10    that employee. Carter has not cited any authority justifying such an award or supporting his

11    calculations, and again, the court has no obligation to speculate about what Carter's argument

12    might be.

13        The court finds that 24 employees (1) worked for Defendants during at least one pay

14    period between August 11, 2017 and August 3, 2019; (2) quit or were terminated from their

15    employment; and (3) on at least one occasion worked in excess of 8 hours without receiving

16    overtime pay. Applying the plain language of section 2699(f), the court finds that Carter is

17    entitled to a civil penalty of $100 per employee who quit or was terminated without receiving their

18    owed overtime. Therefore, the PAGA penalties for Carter's sections 201 and 202 claim is **$2,400**.

19        **F. Wage Deductions**

20            **1. Liability**

21        Labor Code section 221 provides that "[i]t shall be unlawful for any employer to collect or

22    receive from an employee any part of wages theretofore paid by said employer to said employee."

23    California law prohibits "transferring to the employee, by way of wage deductions, the financial

24    burden of business expenses that otherwise would be borne by the employer." *Davis v. Farmers*

25    *Ins. Exch.*, 245 Cal. App. 4th 1302, 1334 (2016). "An employer may 'not require its employees to

26    consent to unlawful deductions from their wages.'" *Aguilar v. Zep Inc.*, No. 13-cv-00563-WHO,

27    2014 WL 4245988, at *15 (quoting *Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal. App. 4th 1109,

28    1111-12 (1995)); *see also* Cal. Lab. Code § 219(a) ("[N]o provision of this article can in any way

49

be contravened or set aside by a private agreement, whether written, oral, or implied.").  The

employer bears the burden of establishing that deductions for "apparently business-related

expenses" are authorized by law.  *Davis*, 245 Cal. App. 4th at 1337.

Carter has established a violation of Labor Code section 221.  Vepa admitted to

implementing the telephone purchase policy and deducting wages pursuant to that policy.  He also

admitted that the telephones were used for work, and even admitted that the plan was illegal.  Tr.

Vol. 2 at 267.  As set forth above, the evidence shows that 7 employees were subject to the phone

policy but only 5 employees had their wages deducted.  The court finds that there were 46

deductions during the pay periods at issue.

### 2.  Remedy

Carter is entitled to damages for his individual section 221 claim in the amount of **$85.60**

(5 deductions of $17.12 each).

With respect to PAGA, neither party correctly identified the correct civil penalty rate for a

section 221 violation, which is provided in section 225.5.  *See* Cal. Lab. Code § 225.5 ("[E]very

person who unlawfully withholds wages due any employee in violation of Section . . . 221 . . .

shall be subject to a civil penalty.").  Section 225.5 awards civil penalties as follows:

> (a) For any initial violation, one hundred dollars ($100) for each failure to
> pay each employee.

> (b) For each subsequent violation, or any willful or intentional violation,
> two hundred dollars ($200) for each failure to pay each employee, plus 25
> percent of the amount unlawfully withheld.

*Id.*  Carter does not argue for the higher rate.  Civil penalties therefore shall be awarded as 46 x

$100 = **$4,600**.

### G.  Unreimbursed Business Expenses

Under California law, employers must indemnify their employees "for all necessary

expenditures or losses incurred by the employee in direct consequence of the discharge of his or

her duties . . . ." Cal. Labor Code § 2802(a). To recover under section 2802, an employee must

show that "(i) [he] made expenditures or incurred losses; (ii) the expenditures or losses were

incurred in direct consequence of the employee's discharge of his or her duties, or obedience to

United States District Court
Northern District of California

the directions of the employer; and (iii) the expenditures or losses were reasonable and necessary." *Marr v. Bank of Am.*, No. 09-cv-05978-WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011), *aff'd sub nom. Marr v. Bank of Am., NA*, 506 F. App'x 661 (9th Cir. 2013).

Carter asserts that Defendants failed to reimburse him for the two-month period at the beginning of his employment when he used his personal phone for work purposes.[16]  Carter testified that he used his personal phone for work for about two months before he signed the telephone policy in January 2017.  He said that he paid $50 per month for his personal phone.  However, Carter failed to prove that he had no choice but to use his own phone during that time period.  Carter testified that Vepa did not provide phones for employees, but Vepa testified that he had phones available for employees' use.  Carter's testimony was brief and ultimately unconvincing.  Carter also did not establish that he suffered any loss from using his own phone for that period of time.  For example, he did not testify that he paid more for his personal phone plan because he used it for work purposes.  Therefore, the court finds that Carter did not prove he is entitled to recovery for a violation of section 2802.  Judgment is granted to Defendants on Carter's individual section 2802 claim.

### H.  Judicial Discretion On the Amount of PAGA Penalties

The total amount PAGA penalties established by Carter is $124,600, which is the sum total of $19,600 for overtime + $98,000 for wage statements + $2,400 for final wages + $4,600 for wage deductions.

PAGA authorizes a court to award a lesser amount that the maximum penalty if "based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  *Huff v. Securitas Sec. Servs. USA, Inc.*, 23 Cal.

---

[16] As previously discussed, Carter originally sought PAGA penalties for section 2802 violations, but the court barred him from pursuing this claim as part of its ruling on Defendants' motion in limine #1.

With respect to Carter's own claims, his counsel clarified that he seeks a remedy for violation of section 2802 for the two-month period from his date of hire in late November 2016 until late January 2017 during which he used his own telephone for work purposes.  After that period, he claims a violation of section 221 for having to pay for a telephone under the telephone purchase plan.  Tr. Vol. 1 at 10:4-11:13.

United States District Court
Northern District of California

App. 5th 745, 759 (2018) (quoting Cal. Lab. Code § 2699(e)(2)).  "[T]he statute incorporates a remedy if the penalty calculation is unfair or arbitrary as applied to a particular employer."  *Id.*  The court may consider "whether the violation was inadvertent."  *Raines*, 23 Cal. App. 5th at 681.  Multiple courts have exercised their discretion to reduce PAGA penalties.  *See, e.g.*, *Fleming v. Covidien Inc.*, No. 10-cv-01487, 2011 WL 7563047, at *4 (C.D. Cal. Aug. 12, 2011) (reducing award where "the aggrieved employees suffered no injury due to the erroneous wage statements, and made no complaint of the errors or omissions contained therein prior to filing suit. Also, Defendants were not aware that the wage statements violated the law and took prompt steps to correct all violations once notified."); *Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1136 (2012) (upholding discretionary reduction in penalties based on trial court's eight factual findings that "the evidence showed . . . defendants took their obligations [as to rest and meal breaks] seriously and attempted to comply with the law.").

Defendants request that the court exercise its discretion to reduce the PAGA award here because they are disproportionally high compared to Carter's own relatively low statutory damages.  Def. FF/CL at 29-30.  They argue that such a disproportionate PAGA award is unjust, where they showed they implemented their workplace policies based on a good faith understanding of the law and committed merely "technical" violations unrelated to criminal or illegal activity.  In particular, they emphasize that the largest component of the total PAGA award is the penalty for wage statement violations under section 226.3, which is simply of the overtime violations.  *Id.*  They say that having to pay over $15,000 may force Defendants to close.  *Id.*

Defendants also argue that the requested PAGA award would violate the Eighth Amendment's Excessive Fines clause of because they are grossly disproportional to Carter's own damages.  They urge that the Eighth Amendment applies in *qui tam*-like cases like PAGA, pointing to *United States ex rel. Shutt v. Community Home & Health Care Services, Inc.*, 305 F. App'x 358, 361 (9th Cir. 2008), in which the Ninth Circuit considered but rejected an "excessive fines" challenge to an award in a False Claims Act (FCA) suit.  That argument was squarely considered and rejected the same argument in *Magadia v. Wal-Mart Associates, Inc.*, 384 F. Supp. 3d 1058, 1106-07 (N.D. Cal. 2019), *rev'd on other grounds*, 999 F.3d 668 (9th Cir. 2021).  There,

the court ruled that the Eighth Amendment does not apply to cases between private parties.  *Id.* at 1106 (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 275 (1989) ("While we agree with petitioners that punitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law, we fail to see how this overlap requires us to apply the Excessive Fines Clause in a case between private parties."))  The court said that although "75% of the PAGA award goes to the State of California by statute . . . [n]onetheless, it is not the State of California that is prosecuting this case against Wal-Mart.  It is Magadia and the class he represents." *Id.* at 1107.  As such, the Eighth Amendment's prohibition against excessive fines was irrelevant.

Defendants do not offer any argument that warrants deviation from *Magadia*.  That PAGA is a "*qui-tam* like" statute is unavailing; as the Ninth Circuit held in *Magadia* on appeal, "PAGA differs in significant respects from traditional *qui tam* statutes" like the FCA.  *Magadia*, 999 F.3d at 676.  "PAGA represents a permanent, *full* assignment of California's interest to the aggrieved employee. . . . [O]nce California elects not to issue a citation, the State has no authority under PAGA to intervene in a case brought by an aggrieved employee." *Id.* at 677 (emphasis in original).  PAGA suits are therefore different than other *qui tam* suits that might be subject to the Eighth Amendment.  As this suit was maintained between private parties, the Eighth Amendment does not apply.

A discretionary reduction under Labor Code section 2699(e)(2) is nevertheless warranted.  The unreduced PAGA penalties amount to $124,600 ($19,600 (overtime) + $98,000 (wage statements) + $2,400 (failure to pay final wages) + $4,600 (wage deductions).  On the record before the court, full PAGA penalties are warranted for the overtime, final wage, and wage deduction violations.  Defendants instituted an unlawful on-duty meal period policy and telephone purchase policy, which resulted in depriving employees of wages while generating more income for the company.  However, the wage statement violations are predominately technical.  Carter presented no evidence that an incorrect wage statement resulted in injury to any aggrieved employee.  Therefore, the court reduces the wage statement PAGA penalty by 90% to $9,800.  The court awards **$36,400** in total PAGA penalties.

**I.   Retaliation**

"To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in a protected activity, (2) that his employer subjected him to adverse employment action, and (3) that there is a causal link between the two."  *Hollie v. Concentra Health Servs., Inc.*, No. 10-cv-5197 PJH, 2012 WL 993522, at *4 (N.D. Cal. Mar. 23, 2012).  "The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision."  *Garcia-Brower v. Premier Auto. Imports of CA, LLC*, 55 Cal. App. 5th 961, 978 (2020) (citation omitted); *see also Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").  Once the plaintiff has established a prima facie case of retaliation, the burden then shifts to the employer to provide a "legitimate, nonretaliatory explanation for its actions."  *Hager v. Cty. of Los Angeles*, 228 Cal. App. 4th 1538, 1540 (2014). To prevail, the plaintiff must show that the employer's explanation is pretextual.  *Id.*

Carter brings claims for retaliation under Labor Code sections 98.6 and 6310.  Although he is not explicit on this point, his section 98.6 claim appears to relate to complaints he made about his wages and Defendants' use of day laborers, while the section 6310 claim relates to his complaints about workplace safety.

**1.   Labor Code § 98.6**

Labor Code section 98.6 prohibits employers from retaliating against employees for, among other things, making "a written or oral complaint that he or she is owed unpaid wages." Cal. Lab. Code § 98.6(a).  Carter's section 98.6 claim appears to be based on complaints he allegedly made about his wages and Defendants' use of day laborers.  *See* Compl. ¶¶ 73-78.

In his opening statement, Carter stated that he was terminated for "complaining about wages and safety conditions."  Tr. Vol. 1 at 32:25-33:8.  He also alluded to complaints he made about not receiving breaks and about Defendants hiring day laborers. Tr. Vol. 1 at 34:23-35:8.

United States District Court
Northern District of California

1    However, Carter's testimony about retaliation focused exclusively on the complaints he made

2    regarding workplace safety.  He did not testify about making specific complaints about his wages,

3    the lack of breaks, or Defendants' hiring of day laborers.  Therefore, there is no evidence in the

4    record that Carter ever complained about wages, breaks, or day laborers, much less that he was

5    retaliated against for doing so.

6            The court grants judgment for Defendants on Carter's section 98.6 claim.

7                          **2.  Labor Code § 6310**

8            Labor Code section 6310 prohibits employers from "discharge[ing] or in any manner

9    discriminat[ing] against any employee because the employee has . . . [m]ade any oral or written

10   complaint to the division, other governmental agencies having statutory responsibility for or

11   assisting the division with reference to employee safety or health, their employer, or their

12   representative."  Cal. Lab. Code § 6310(a)(1).

13           Carter testified that he complained about his working conditions three times.  His first

14   complaint related to an incident around February 2017 when he and other Junk King employees

15   were required to clean out a homeless encampment filled with needles and human waste.  Carter

16   testified that Vepa told them they had to complete the job or they would be fired.  He also testified

17   that Vepa refused to provide basic safety equipment like masks and gloves.

18           Carter's second complaint related to an incident that happened around spring or summer

19   2017, when he performed a job at a residential home that he described as a "hoarder's house."

20   Carter testified that there were large piles of items and trash, animal waste, human diapers, and

21   two cat carcasses.  Carter testified that he called Vepa and told him about the incident.  Although

22   he was not explicit on this point, Carter implied that he and the other employees were forced to

23   keep working on the job.  Vepa again refused to provide safety materials such as masks, gloves,

24   and feet coverings.

25           Carter's third complaint related to a job he and other employees performed in an

26   abandoned house at an unspecified time.  The roof of the house was collapsed in and one of the

27   workers fell halfway through the floor.  There were also rats and milk jugs filled with human

28   urine.  When the employees called Vepa to complain about the unsafe working conditions, he

1    "didn't care" that the employee had fallen partially through the floor and "just wanted to know

2    how long . . . it was going to take us to finish the job."

3            The court finds that Carter has not met his burden to prove that he suffered retaliation for

4    complaining about his working conditions.  The first two incidents happened in February 2017 and

5    spring or early summer 2017, well before his termination in August 2017.  Carter did not provide a

6    date for the third incident.  It is not clear whether it occurred before or after or between the other

7    two incidents.  As such, he has not established a causal connection between his complaint about

8    that incident and his termination.  Further, Vepa credibly testified that he fired Carter for the job

9    he and Parshey completed two days before they were both fired.  Tr. Vol. 2 at 287:3-4; Tr. Vol. 3

10   at 430:7-9.  Vepa stated that he fired them both because the price for the job was underquoted and

11   they did not respond to texts or calls before they finished the job.  Tr. Vol. 2 at 287:17-24, 289:14-

12   17, 301:10-14.  It also appeared to Vepa that Parshey had gone behind his back in negotiating the

13   deal with the customer.  Tr. Vol. 2 at 292:6-9.

14           Vepa's explanation for Carter's termination is convincing.  Further, Vepa fired Parshey at

15   the same time, which makes it more likely that both terminations took place because of the

16   underquoted job rather than in retaliation for complaints that Carter made some unspecified

17   months prior.  While Carter's termination might have been unfair given that it was Parshey who

18   negotiated the underquoted job, unfair is not illegal.  Accordingly, the court finds that Vepa has

19   offered a legitimate and nonretaliatory explanation for firing Carter.  Carter has not met his burden

20   to prove that the explanation is pretextual.

21           The court grants judgment for Defendants on Carter's section 6310 claim.

22           **J.  Wrongful Termination**

23           Carter also brings a claim for wrongful termination.  "The elements of a claim for wrongful

24   discharge in violation of public policy are (1) an employer-employee relationship, (2) the

25   employer terminated the plaintiff's employment, (3) the termination was substantially motivated

26   by a violation of public policy, and (4) the discharge caused the plaintiff harm."  *Yau v. Allen*, 229

27   Cal. App. 4th 144, 154 (2014).

28           Carter's wrongful termination claim is premised solely on his statutory retaliation claims.

1    Since those claims fail for the reasons stated above, Carter's derivative claim for wrongful

2    termination also fails.  The court grants judgment for Defendants on this claim.

3        **K.  UCL**

4        Under the UCL, unfair competition is defined as "any unlawful, unfair or fraudulent

5    business act or practice" and "unfair, deceptive, untrue or misleading advertising."  *See* Cal. Bus.

6    & Prof. Code § 17200.  A business practice is "unlawful" under section 17200 if it violates an

7    underlying state or federal statute or common law.  *See Cal-Tech Commc'ns, Inc. v. Los Angeles*

8    *Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  An act is "unfair" if the act "threatens an incipient

9    violation of a [competition law], or violates the policy or spirit of one of those laws because its

10   effects are comparable to or the same as a violation of the law."  *Id.* at 187.  To the extent the

11   claims sound in fraud, they are subject to the heightened pleading standards of Rule 9(b).  *See*

12   *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

13       In his post-trial briefing, Carter does not make any claims under the UCL or even mention

14   it.  The court therefore declines to award any relief under the UCL and grants judgment to

15   Defendants on this claim.

16   **III.   CONCLUSION**

17       In summary, the court finds that Carter prevailed on his individual claims for (1) meal

18   break violations; (2) Labor Code "9th Hour" overtime; (3) derivative wage statement violations;

19   (4) final wages, and (5) wage deductions, and grants judgment to Carter on those claims.  The

20   court also finds that Carter is entitled to relief under PAGA on behalf of himself and 34 aggrieved

21   employees for (1) 9th hour overtime; (2) derivative wage statement violations; (3) final wages, and

22   (4) wage deductions.

23       However, the court finds that Carter did not prove his claims for (1) rest break violations;

24   (2) FLSA overtime; (3) Labor Code "off-the-clock" overtime; (4) unreimbursed business

25   expenses; (5) retaliation; (6) wrongful termination, and (7) UCL violations—nor that he is entitled

26   to statutory damages for his wage statement violations.  Judgment is granted to Defendants on

27   those claims.  The court also finds that Carter failed to show he is entitled to PAGA relief for meal

28   break violations.

United States District Court
Northern District of California

1    Based on the foregoing, the court awards Carter individual damages of **$5,267.10**,

2  calculated as $1,679.75 in meal period premiums + $21.75 in unpaid overtime + $3,480 in waiting

3  time penalties + $85.60 in wage deductions.  The court also awards PAGA penalties in its

4  discretion of **$36,400**.

5    Judgment is rendered to Carter and Defendants in accordance with this opinion.  The clerk

6  shall close the case.

7

8    **IT IS SO ORDERED.**

9  Dated: May 24, 2022



Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28